UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

---

ALLSTATE INSURANCE COMPANY;
ALLSTATE FIRE AND CASUALTY
INSURANCE COMPANY;  ALLSTATE
PROPERTY AND CASUALTY
INSURANCE COMPANY; and ASMI AUTO
INSURANCE COMPANY,

                  Plaintiffs,

v.

MICHIGAN PAIN MANAGEMENT
PLLC; DEARBORN PAIN
SPECIALISTS, PLLC; LABORATORY
SPECIALISTS OF MICHIGAN, LLC;
and JAMES PADULA, D.O.,

                  Defendants.

C.A. No. _____


**Demand for Jury Trial**

---

## COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company,  Allstate Property and Casualty Insurance Company, and ASMI Auto Insurance Company (hereinafter, "Allstate" and/or "plaintiffs") hereby allege as follows.

## I.   INTRODUCTION

1.     This is a case about medical clinics, a drug testing laboratory, and their owners and representatives who abused the medical benefits available under the

1

Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Allstate by submitting false and fraudulent records, bills, and invoices through interstate wires and the U.S. Mail seeking to collect payment from Allstate for treatment and services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered pursuant to applicable statutes and regulations, including the Michigan No-Fault Act.

2.      The insurance fraud scheme perpetrated by defendants Michigan Pain Management PLLC ("Michigan Pain"), Dearborn Pain Specialists, PLLC ("Dearborn Pain"), Laboratory Specialists of Michigan, LLC ("Laboratory Specialists"), and James Padula, D.O. ("Padula") (collectively, the "defendants") was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants pursuant to Michigan's No-Fault Act to which the defendants were not entitled under state and federal law.

3.      All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

4.      By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

Allstate also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

5.     As a result of the defendants' fraudulent acts, Allstate has paid in excess of half a million dollars to them related to the patients at issue in this Complaint.

## II.   THE PARTIES

### A.   PLAINTIFFS

6.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and ASMI Auto Insurance Company are each a company duly organized and existing under the laws of the State of Illinois.

7.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and ASMI Auto Insurance Company each have their respective principal places of business in Northbrook, Illinois.

8.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.   DEFENDANTS

#### 1.   Michigan Pain Management PLLC

9.     Defendant Michigan Pain Management PLLC is a professional limited liability company organized under the laws of the State of Michigan.

10.    Michigan Pain's member is defendant Padula, who is a citizen of the State of Florida.

11.    At all relevant times, Michigan Pain was operated and conducted by defendants Dearborn Pain, Laboratory Specialists, and Padula.

12.    Michigan Pain billed Allstate for services that were not rendered, and for treatment that was unlawful and medically unnecessary and that was billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 1.

### 2.    Dearborn Pain Specialists, PLLC

13.    Defendant Dearborn Pain Specialists, PLLC is a professional limited liability company organized under the laws of the State of Michigan.

14.    Dearborn Pain's member is defendant Padula, who is a citizen of the State of Florida.

15.    At all relevant times, Dearborn Pain was operated and conducted by defendants Michigan Pain, Laboratory Specialists, and Padula.

16.    Dearborn Pain billed Allstate for services that were not rendered, and for treatment that was unlawful and medically unnecessary and that was billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 2.

### 3.    Laboratory Specialists of Michigan, LLC

17.    Defendant Laboratory Specialists of Michigan, LLC is a limited liability company organized under the laws of the State of Michigan.

18.    Laboratory Specialists's members are defendant Padula, Arthur Schnur ("Schnur"), and Jonathan Maffia ("Maffia"), all of whom are citizens of the State of Florida.

19.    At all relevant times, Laboratory Specialists was operated and conducted by defendants Michigan Pain, Dearborn Pain, and Padula.

20.    Laboratory Specialists billed Allstate for services that were not rendered, and for services that were unlawful and medically unnecessary and that were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 3.

### 4.    James Padula, D.O.

21.    Defendant Padula is a resident and citizen of the State of Florida.

22.    At all relevant times, Padula owned, operated, and controlled defendants Michigan Pain, Dearborn Pain, and Laboratory Specialists.

## III.    JURISDICTION AND VENUE

23.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action on the basis of the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq*., because they arise under the laws of the United States.

24.    Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

25.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

26.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.    BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME

27.    The RICO enterprises identified herein – Michigan Pain, Dearborn Pain, and Laboratory Specialists (collectively, the "enterprise defendants") – were organized and are managed by residents and citizens of Florida and were set up solely to take advantage of the benefits available under Michigan's No-Fault law.

28.    Because Michigan Pain and Dearborn Pain (collectively, the "defendant clinics") operate as medical clinics, the defendants claim that they are solely owned and managed by defendant Padula.

29.    In reality, the clinic defendants are also operated and managed by laypersons, including Maffia and Albert Jerome, D.C. ("Jerome").

30.    The defendants used the enterprise defendants to submit exorbitant charges to Allstate for purported medical services, procedures, equipment, and

6

testing that were not actually provided, were not medically necessary, and were fraudulently billed.

31.    The purpose of the scheme was to generate the highest possible amount of charges to Allstate to abuse the Michigan No-Fault Act, which provides for the payment of medical and rehabilitative benefits on a first-party payor basis for injured victims of motor vehicle accidents.  Mich. Comp. Laws § 500.3107(1)(a).

32.    Part of the defendants' motivation to bill grossly excessive amounts was that they sold their accounts receivable to third-party factoring/funding companies for a percentage of the face value of the bill, which was a mere fraction of the amount they charged to Allstate.  Thus, the higher the amount of the bill (even with no basis in reality and even with no connection to the relative value of the service allegedly provided), the more money the defendants' percentage take was.

33.    The defendants are interrelated and share ownership and management that created an incentive for the defendants to cooperate in order to generate bills for medically unnecessary services.

34.    As part of their scheme, for example, the defendants utilized the defendant clinics to order medically unnecessary urine drug testing billed by defendant Laboratory Specialists in order to generate additional billing to Allstate.

35.     Further demonstrating the interrelationship and cooperation between the defendants to implement their scheme, the defendant clinics utilized one another's facilities to generate additional unnecessary billing.

36.     For example, Dearborn Pain billed Allstate for treatment it allegedly rendered to P.W. (Claim No. 0685611204)[1] on January 3, 2023 at Michigan Pain's office address and utilizing Michigan Pain's medical equipment at that location.

37.     Dearborn Pain also billed for allegedly assisting with services billed by Michigan Pain as the primary provider, including, for example, charging $25,000 for purported surgical assistance for a procedure to D.H. (Claim No. 0575041157) on February 2, 2021.

38.     Defendant Laboratory Specialists has affirmed in other litigation that its billing was developed and submitted by David Winter ("Winter"), a consultant from Florida who has a lengthy history of manipulating bills in Michigan to take advantage of the medical insurance benefits provided by the No-Fault Act.

39.     Winter also prepared billing for Dearborn Pain and intermingled the billing submitted by Dearborn Pain and Laboratory Specialists, as bills for services

---

[1] To protect the confidentiality of the patients at issue herein, Allstate refers to them by initials and Allstate claim number.  As the defendants only submit bills to Allstate using the Allstate claim number, they are aware of these patients and can identify them by the information provided herein.

allegedly rendered by Laboratory Specialists were submitted to Allstate for payment using Dearborn Pain's taxpayer identification number.

40.    The scheme described herein was driven by Padula and his layperson associates (including Maffia and Jerome), who implemented a predetermined treatment protocol at the defendant clinics that included aggressively billing for medical services that were unnecessary and unsupported by applicable standards of care and patients' conditions, and automatically ordering medically unnecessary urine drug testing that was facilitated by Laboratory Specialists, which then billed for the urine drug testing that it knew was medically unnecessary and fraudulent.

41.    The defendants' predetermined treatment protocol used non-specific diagnoses of injuries, such as neck and back "sprains" and "strains," in order to create the appearance of necessity of treatment billed to Allstate and to pressure patients to undergo further medically unsupported and unnecessary testing and treatments, such as injections, that were then fraudulently billed to Allstate by Michigan Pain and Dearborn Pain as described below.

42.    The defendants' predetermined course of treatment also included automatic and regular – typically monthly – patient re-evaluations at the defendant clinics, at which time the defendants continued to implement their predetermined treatment protocol, including issuing ongoing orders for additional unnecessary

urine drug testing and continued physical therapy, and providing continuous refills of various prescription medications.

43.    At each patient visit, the defendant clinics continued recommending that same course of treatment without adequately evaluating prior treatment, including failing to evaluate whether previous treatments such as injections were helpful and whether the medications being prescribed were beneficial or effective.

44.    Similarly, the defendant clinics ordered urine drug testing without assessing the need for such testing, and then automatically ordered repeated testing at each subsequent patient appointment without evaluating the results of prior testing, proving there was no medical reason for ordering the testing in the first place.

45.    As a result of the defendants' implementation of this predetermined treatment protocol, dozens of patients received scores of urine drug testing that was entirely unnecessary and that was never utilized in the patients' care.

46.    The treatment protocol also included pressuring patients to undergo outrageous numbers of injections and related procedures that were not supported by clinical findings and that often were contrary to established standards of care.

47.    Recommendations for injections often began at patients' initial evaluations, prior to attempting conservative treatment.

48.     Recommendations for repeated and additional injections then were made at follow up visits without properly evaluating the effectiveness of previous injections, and even when previous injections were not beneficial.

49.     The outrageous numbers of injections recommended and billed by the defendant clinics, and their disregard of patient welfare in implementing their predetermined treatment protocol is exemplified by C.B. (Claim No. 0571268069), with respect to whom Michigan Pain billed Allstate for thirteen (13) injections over a period of less than three (3) months.

50.     After she stopped treating at Michigan Pain, C.B. reported to another provider that "she was given so many [injections] that it sent her into adrenal insufficiency."

51.     Patients of Michigan Pain and Dearborn Pain frequently received dozens of alleged injections that were not medically justified, including repeated injections after the initial injections had failed, and injections that were intended to treat conditions they did not have.

52.     Another aspect of the defendants' scheme was the improper use of opioid medications to induce treatment.

53.     Multiple patients have reported that they were told by representatives of the defendant clinics that they could not continue to treat or receive further opioid prescriptions if they declined to receive injections from the defendants.

54.     As one example of this practice, D.P. (Claim No. 0645111709), who was a patient at Michigan Pain, testified that he "told them I didn't like it . . . I didn't like the shots they were giving to me" but that the doctors at Michigan Pain "told me that was the only way I was going to get my medication."

55.     That the defendant clinics' orders for medical services were motivated by financial gain rather than medical necessity is further evidenced by D.P.'s testimony describing the defendant clinics' practice of pressuring patients to undergo injections and other procedures that they knew were not helping and often were actively harmful, with D.P. stating that the injections he received "broke my body out and it made me hurt," yet Michigan Pain continued to insist on additional injections.

## V.      BILLING FOR SERVICES NOT RENDERED

56.     The defendants regularly submitted bills to Allstate seeking payment for treatment and services that were never rendered to patients at issue herein.

57.     The defendants' pervasive conduct of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as many bills for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

58.    All of the bills submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

59.    Allstate is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

A.    **MICHIGAN PAIN AND DEARBORN PAIN BILLED FOR INJECTIONS NOT PERFORMED**

60.    Michigan Pain and Dearborn Pain routinely billed for injections that did not occur by billing for purported treatments at spine levels that were not actually treated.

61.    As part of their scheme to multiply charges, the defendants' predetermined protocol for injections included always billing for certain injections bilaterally and at multiple vertebral levels.

62.    For example, when the defendants billed for alleged facet injections, they nearly always claimed to administer the injections at three (3) vertebral levels and bilaterally.

63.    A facet joint is located in the space between the bones of the spinal column, such that a two (2) level facet joint injection involves three (3) vertebral levels.

13

64.     The defendant clinics regularly billed for injecting three (3) facet joints when at most (2) injections were given.

65.     As an example of this practice, Michigan Pain billed Allstate through the U.S. Mail for bilateral cervical medial branch block injections at three vertebral levels to J.W. (Claim No. 0609295802) on December 22, 2020.

66.     The alleged injections to J.W. on December 22, 2020, if they occurred at all, were only at vertebral levels C4 - C6, which address facet joints between C4 - C5 and C5 - C6, and consist of two levels, not three levels as billed.

67.     Frequently, the defendant clinics billed for medial branch block injections at multiple levels, but failed to document or confirm that the injections actually occurred at each level.

68.     Instead, the defendants use cloned reports for these alleged procedures that failed to confirm that the services billed were actually performed.

69.     For example, Dearborn Pain billed for bilateral lumbar medial branch block injections at three (3) vertebral levels with respect to A.M. (Claim No. 0634145262) on October 6, 2021.

70.     The report of the alleged procedure states only that "each site was identified" and that a "needle was advanced to the anatomic location of each medial branch," and does not actually identify the specific medial branches where injections

occurred and does not indicate that the injections occurred bilaterally as billed, making it impossible to confirm that the procedure billed actually occurred at all.

71.     As addressed and exemplified above, the defendants routinely billed for more vertebral levels than were actually injected, making actual documentation that injections were performed critical.

72.     Demonstrating that the defendants utilized this cloned language to disguise what medical treatment was actually provided, Dearborn Pain also billed for bilateral lumbar medial branch block injections at three (3) vertebral levels with respect to A.C. (Claim No. 0616143616) on October 26, 2021.

73.     The procedure report for A.C. includes exactly the same language quoted with respect to patient A.M., confirming that Dearborn Pain simply copied and pasted the same generic language each time it billed for these alleged procedures.

74.     In addition to over-counting the number of levels allegedly injected, the defendants also billed for injections that simply were not done at all.

75.     For example, Michigan Pain billed for alleged bilateral trigger point injections to S.T.'s (Claim No. 0670101484) trapezius muscles, three-level bilateral cervical facet blocks (six (6) total cervical injections), and a caudal epidural steroid injection on August 18, 2022.

76.     A case manager accompanied S.T. to this appointment and witnessed the procedure, and reported that only a single cervical injection was done on that date.

77.     As another example, Michigan Pain billed Allstate through the U.S. Mail for an initial evaluation of J.B. (Claim No. 0600787436) on September 22, 2020, just three (3) days after her alleged motor vehicle accident.

78.     Michigan Pain did not document any physical examination that day, and the "objective," "assessment," and "plan" sections of its report were all left blank.

79.     Michigan Pain also billed Allstate for a trigger point injection allegedly administered to J.B. on the date of this initial examination, but its own records for that date demonstrate that no such injection occurred, nor would there have been any medical basis for an injection given the limited examination of J.B., if any actually occurred, on that date.

80.     Medical treatment that is not documented did not occur for purposes of medical billing, and billing for undocumented medical care constitutes billing for services not rendered.

81.     The defendants' own physicians also confirmed that the outrageous amounts of injections for which they billed did not occur.

82.     For example, Michigan Pain billed for alleged shoulder injections to D.J. (Claim No. 0643459217) on January 11, 2021 and March 11, 2021.

83.     On April 19, 2021, D.J. was allegedly evaluated by Michigan Pain's orthopedist for a surgical consultation, and this physician expressly reported that D.J. "has not had any injections."

## B.  MICHIGAN PAIN AND DEARBORN PAIN BILLED FOR DME NOT PROVIDED

84.     Michigan Pain and Dearborn Pain frequently billed Allstate for durable medical equipment ("DME") such as lumbar braces and knee braces they purportedly issued to patients during office visits, but for which there was no actual prescription and no evidence of delivery.

85.     Reports from purported patient visits to the defendant clinics on dates that DME was billed reflect that the DME often was not actually supplied to the patient, or that the type of DME billed was not what patients received.

86.     Evaluation reports from the defendant clinics consistently include identical cut-and-pasted language in the "plan" section of the reports stating that, for example, a "back brace [was] given today," but do not include an actual prescription for the device, do not identify the type or model of back brace or other DME allegedly supplied, and never include any record confirming receipt of the DME by the patient.

87.     As additional evidence that the DME billed by the defendant clinics was not actually provided to patients, the defendants typically billed Allstate for DME that must be specifically fitted or customized to the individual patient by a person with expertise, something that never occurred as confirmed by the defendant clinics' own reports.

88.     As one example of this practice, defendant Michigan Pain billed Allstate $1,800 through the U.S. Mail for a lumbar back brace allegedly provided to D.W. (Claim No. 0615676541) at her initial visit to Michigan Pain on December 8, 2020, using Healthcare Common Procedure Coding System ("HCPCS") code L0631.

89.     HCPCS Code L0631 identifies a model of lumbar-sacral orthosis "that has been trimmed, bent, molded, assembled, or otherwise customized to fit a specific patient by an individual with expertise."

90.     The report for D.W.'s visit to Michigan Pain on December 8, 2020 states only "back brace given today," but provides no indication of the type or model of lumbar brace allegedly supplied to D.W., does not refer to any customization of the lumbar brace to D.W. at the visit, and includes no record acknowledging receipt of any type of back brace by D.W.

91.     While there is no evidence that a lumbar brace was ever delivered to D.W. at all, even if D.W. did receive a lumbar brace it was not the customized lumbar-sacral orthosis billed by Michigan Pain using HCPCS code L0637.

92.     Instead, Michigan Pain billed for that item of DME simply to increase the amount it was able to charge to Allstate for each patient.

93.     Dearborn Pain utilized the same practice as Michigan Pain by billing for DME that its own records demonstrate was not actually provided to patients.

94.     On December 29, 2020, Dearborn Pain billed Allstate $595 through the U.S. Mail using HCPCS code L1820, which describes a type of knee brace that includes fitting and/or adjustment for the individual patient, with respect to patent H.A. (Claim No. 0591432406).

95.     Dearborn Pain's report for H.A.'s alleged evaluation on that date included neither a recommendation for a knee brace for H.A. nor even a generic statement that any type of knee brace was provided to H.A., and certainly did not identify the model of knee brace it subsequently billed to Allstate, report that any knee brace was fitted to H.A., or provide any evidence of actual delivery of a knee brace to H.A.

96.     All of the bills submitted by defendants Michigan Pain and Dearborn Pain to Allstate seeking payment for DME that was not actually supplied to patients are fraudulent.

97.    Allstate is not required to pay the defendants for DME that was never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

## C.    THE DEFENDANTS BILLED FOR PATIENT RE-EVALUATIONS THAT DID NOT OCCUR

98.    Michigan Pain and Dearborn Pain each billed Allstate for patient re-evaluations that did not occur.

99.    Many purported re-evaluations were billed on the same day patients reported to one of the defendant clinics to receive purported injections and, as discussed herein, could not properly be billed separately even if they occurred.

100.    However, on many of the dates where the defendants billed Allstate for both injections and a patient re-evaluation, no actual re-evaluation was performed at all.

101.    As an example of this practice, Michigan Pain billed Allstate for alleged injections administered to H.N. (Claim No. 0644037756) on February 23, 2022, and also billed $420 for an alleged patient re-evaluation that day.

102.    H.N. already had undergone a purported re-evaluation just seven (7) days earlier, on February 16, 2022, with the plan that H.N. would return on February 23, 2022 for the injections recommended by Michigan Pain.

103.   Proving that no additional evaluation occurred on February 23, 2022, the report prepared by Michigan Pain for that day simply copied verbatim most of the February 16, 2022 report, and the "Objective," "Assessment," and "Plan" portions of the two reports are identical.

104.   Indeed, the treatment plan on February 23, 2022 includes identical language that was in the February 16, 2022 report stating that "patient states she has work today and is off on the 23rd and would like to do the injections when she is off work."

105.   Reports for purported re-evaluations billed by the defendant clinics routinely contain similar, and often identical, stock language and phrases, and repeatedly copy language used in earlier patient reports, proving that even if patients appeared at the defendant clinics for prescription refills, injections, and disability findings, no actual patient evaluation occurred.

### D.   LABORATORY SPECIALISTS BILLED FOR URINE DRUG TESTING NOT PERFORMED

106.   Laboratory Specialists frequently billed Allstate for urine drug testing that did not occur.

107.   On nearly every date it billed Allstate for alleged urine drug testing, Laboratory Specialists submitted more than two (2) dozen separate charges for different purported tests in addition to alleged presumptive testing.

108. Presumptive drug testing refers to urine testing that offers providers rapid results that identify the presence or absence of numerous classes of medications in a urine sample, and allows a provider to ascertain whether patients may be abusing or diverting potentially dangerous medications and to determine the need for further individualized, specific definitive drug tests where there is an unexpected positive test result.

109. Typically, presumptive drug testing is conducted using reagent dipsticks that can be purchased for less than $1.00, takes only seconds to perform, and is visually interpreted by the individual conducting the testing.

110. Laboratory Specialists routinely billed Allstate $1,200 for presumptive drug testing, claiming to have used instrument chemistry analyzers and mass spectrometry either with or without chromatography, but its reports never identify use of these methods.

111. Laboratory Specialists also billed for entire panels of urine drug testing on specific dates that did not occur at all.

112. For example, E.S. (Claim No. 0569368137) testified that he never provided a urine sample when he appeared at Michigan Pain for treatment following an alleged automobile accident, and specifically denied that the signature on a Laboratory Specialists order form submitted to Allstate dated December 14, 2021 was his.

113.   Despite this, Laboratory Specialists billed Allstate more than $2,471 for both presumptive urine drug testing and two (2) dozen definitive urine drug tests on that date that could not have been performed without a urine specimen.

114.   All of the bills submitted by Laboratory Specialists to Allstate seeking payment for urine drug testing that did not actually occur are fraudulent.

115.   Allstate is not required to pay the defendants for testing related to patients at issue in this Complaint that did not take place and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

### E.   BILLING FOR EXPERIMENTAL PROCEDURES NOT RENDERED

116.   As described further herein, the defendant clinics frequently billed for purported trigger point impedance imaging ("TPII") and localized intense neurostimulation therapy ("LINT") using a machine called a Nervomatrix that was medically unnecessary, and they also billed for those treatments even when they did not actually occur.

117.   TPII consists of testing that is used to confirm a diagnosis of myofascial pain syndrome and to identify and localize myofascial trigger points that are then treated using LINT.

118. Other providers that purport to treat patients with TPII and LINT have testified that LINT treatment can only be provided by a Nervomatrix machine if the TPII scan identifies at least ten (10) potential trigger points for treatment.

119. Despite this, the defendants billed Allstate for purported LINT even when ten (10) trigger points were not identified, and did so even when their own records show that no LINT service was rendered.

120. For example, Michigan Pain billed for both alleged TPII and LINT services with respect to D.J. (Claim No. 0643459217) on September 12, 2022, but the report for the alleged TPII that day found zero potential trigger points, meaning LINT could not have occurred as there were no areas identified to treat.

121. Michigan Pain's own records confirm that the LINT billed did not actually occur, since the printout for the alleged procedure reports that the "strength" of the treatments at each purported trigger point was zero, meaning no treatment actually was administered:

VAS Pain Score:
Date:          Pre-treatment VAS: 0
Date:          Post-treatment VAS: 0

| Row | Probe | Strength | Type | Status | Value | PulseWidth | Frequency | Amplitude | Duration |
|-----|-------|----------|------|--------|-------|------------|-----------|-----------|----------|
| 1 | 14 | 0 | 0 | 1 | 8824 | 300 | 8 | 0.4 | 0.5 |
| 1 | 16 | 0 | 0 | 1 | 8914 | 300 | 8 | 0.4 | 0.5 |
| 1 | 25 | 0 | 0 | 1 | 8950 | 300 | 8 | 0.4 | 0.5 |
| 4 | 16 | 0 | 0 | 1 | 8930 | 300 | 8 | 0.4 | 0.5 |
| 6 | 5 | 0 | 0 | 1 | 8885 | 300 | 8 | 0.4 | 0.5 |
| 6 | 14 | 0 | 0 | 1 | 8907 | 300 | 8 | 0.4 | 0.5 |
| 6 | 19 | 0 | 0 | 1 | 9000 | 300 | 8 | 0.4 | 0.5 |
| 7 | 16 | 0 | 0 | 1 | 8854 | 300 | 8 | 0.4 | 0.5 |
| 9 | 7 | 0 | 0 | 1 | 9000 | 300 | 8 | 0.4 | 0.5 |
| 10 | 16 | 0 | 0 | 1 | 8806 | 300 | 8 | 0.4 | 0.5 |

### F.   BILLING FOR SURGICAL PROCEDURES NOT PERFORMED

122.   The defendants also billed for surgeries and components of surgeries that were not performed.

123.   Part of the defendants' predetermined protocol was to repeatedly recommend that patients undergo experimental discogram procedures administered by Padula.

124.   Each time these procedures were performed, the defendants falsely represented to Allstate that they were done through an open surgical procedure rather than the percutaneous procedures actually performed, if performed at all.

125.   Michigan Pain and Dearborn Pain submitted charges using CPT code[2] 63056, which describes a transpedicular or costovertebral open incision surgical approach for each such procedure allegedly performed.

126.   The procedures actually performed by the defendants were needle-based and visualized by endoscope or fluoroscopy; open surgeries were never performed.

127.   For example, a procedure billed for D.H. (Claim No. 0575041157) on February 2, 2021 was described as using a fluoroscope to guide needle placement,

---

[2] CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.  Providers who are subject to the Health Insurance Portability and Accountability Act ("HIPAA") are required to use CPT codes.

but both Michigan Pain and Dearborn Pain billed for an alleged open surgical procedure.

128.   In addition to the operative note describing a needle-based procedure, the fact than an open surgical procedure was not performed on D.H. is further confirmed by the facts that (1) the surgical center at which the procedure was allegedly done did not bill for an open procedure and (2) D.H. was administered only local anesthesia.

129.   The defendants falsely represented the nature of the procedures actually performed in an attempt to justify charges to Allstate that were many times higher than the percutaneous procedures actually performed.

130.   The defendants also added charges to alleged arthroscopy surgeries to joints that were not actually done.

131.   When the defendant clinics billed for alleged shoulder arthroscopy procedures, they frequently included a charge for extensive debridement using CPT code 29823.

132.   A charge for extensive debridement is only proper when the procedure involves debriding three (3) discrete structures in the shoulder and a separate billing code exists for limited debridement of a single area.

133.   The defendants billed using this code even when at most a single area of the shoulder was debrided.

134.   For example, Michigan Pain billed for extensive debridement of A.S.'s (Claim No. 0650992894) shoulder on February 9, 2022, even though at most a single area – A.S.'s labrum – was debrided.

135.   The defendants also billed for components of spinal surgeries that were not done, including for alleged vertebral corpectomies.

136.   A corpectomy is a significant procedure that is only performed when a surgery involves removal of more than 50% of a patient's cervical vertebrae.

137.   In the lumbar spine, a corpectomy is only performed when at least one-third of the vertebrae is removed.

138.   Bone shaving, decompression, and other removal of portions of vertebrae are typical components of the types of spine surgeries the defendants claimed to perform and are not corpectomies and are not separately billable procedures.

139.   The type of bone removal performed by the defendants, if any was done at all, was the type incidental to performing other procedures and did not involve removal of large portions of patients' vertebrae to constitute corpectomies.

140.   As one example, Michigan Pain billed for multilevel corpectomies to K.B. (Claim No. 0472636497) on November 17, 2020 (cervical spine) and January 17, 2021 (lumbar spine) but did not report any vertebral removal more significant

than the typical decompression done during the fusion procedures billed on those dates.

141.   All of the bills submitted by the defendants for treatment that did not actually occur are fraudulent, and Allstate is entitled to recover payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

## VI.   UNLAWFUL SOLICITATION BY THE DEFENDANTS

### A.   MICHIGAN'S ANTI-SOLICITATION LAWS

142.   The solicitation and exploitation of motor vehicle accident victims for profit or professional gain is strictly prohibited in the State of Michigan, as is the use of factors other than legitimate medical judgment to bill insurers like Allstate.

143.   Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" from "employ[ing] any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

144.   Other conduct prohibited under Michigan law ranges from the identification and solicitation of potential patients of medical providers, to the use of agents to solicit patients, and to the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

145.   It is also illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b, and to use police reports to solicit any person identified in the report, Mich. Comp. Laws § 257.503(1)(a).

146.   Only "lawfully-render[ed] treatment" is compensable under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157(1).

147.   As set forth more fully below, the defendants participated in and willingly benefited from schemes to solicit patients through conduct prohibited under Michigan law.

### B.   IMPROPER AND UNLAWFUL METHODS USED TO SOLICIT PATIENTS

148.   Despite Michigan's prohibition on patient solicitation, the defendants actively employed unlawful and improper methods to obtain patients.

149.   Numerous patients have reported receiving phone calls within days of their alleged accidents from persons soliciting them to appear at the defendant clinics.

150.   For example, patient J.W. (Claim No. 0609295802) testified that he was contacted directly by Michigan Pain after his auto accident, and that Michigan Pain then arranged transportation for J.W. to its office:

> Q: Do you recall how -- your first initial evaluation with Michigan Pain, how did that transportation get set up for you?

29

A: I don't know. I just know that I received a call and they wanted me to come in and see them.

Q: So you received a call from Michigan Pain and they said, hey, we'll send you a car to come in and see us?

A: Yes.

151. Other patients have testified that they were contacted by law firms after their auto accidents and then directed to the defendant clinics for treatment.

152. As D.J. (Claim No. 0643459217) explained in her deposition, "I can't even tell you where the doctors came from. I just know a law firm . . . contacted me and they had all these doctors in line for me, all of them – even Dr. Shukr [at Michigan Pain]."

153. The unlawful solicitation and unqualified referral of patients to the defendants by laypersons was an improper non-medical factor that directly led to the unnecessary and otherwise fraudulent bills submitted to Allstate detailed herein.

154. The referral of alleged accident victims to the defendant clinics bore no relation to the medical necessity of the patients at issue in this Complaint, who would not have sought treatment but for the unlawful solicitation and referrals.

155. The defendants enabled and participated in this system of solicitation and referrals in order to obtain patients on whom they could impose their predetermined treatment protocol as described herein in order to bill for excessive

and medically unnecessary treatment designed to maximize the charges billed to Allstate under the No-Fault Act.

156.   Accordingly, the defendants' treatment of the solicited patients constituted unlawful, unreasonable, and unnecessary services that are not payable under the No-Fault Act.

## VII.   **FALSIFIED MEDICAL RECORDS**

157.   The defendants created and submitted medical records that were altered, forged, and fabricated in an effort to conceal their fraud and to create the appearance of significant injury in order to justify their bills.

158.   The forged, altered, and falsified documents created by the defendants were submitted to deceive Allstate into paying for treatment and services that were illegal, medically unnecessary, or not rendered at all.

159.   As described previously, one way the defendants did this was by using identical, cloned language in reports for injections and other procedures that make it impossible to determine what medical service, if any, actually was provided.

160.   Another way the defendants falsified records was by falsifying information provided by patients that was recorded in evaluations and procedure reports, such as the results of injections the defendant clinics billed.

161.   The procedure report form prepared by the defendant clinics for the injections billed to Allstate each purport to record the level of pain reported by the

patient on a scale of one to ten, with ten being the worst, in the area where the injection allegedly occurred, both before and after the billed procedure.

162.   Frequently, the reports stated that patients were instructed to contact the defendant clinic a few hours after the injections and report their pain level.

163.   Nearly every procedure report prepared by the defendant clinics for alleged injections billed to Allstate states that the patient reported that his or her pain level was zero (0) following the injection; in other words, that the patients reported they were experiencing no pain at all.

164.   It is not possible that every patient experienced complete relief of their pain as a result of each of the hundreds of injections billed by the defendants at issue in this Complaint, and the results reported by the defendant clinics were fabricated to justify the procedures and to justify recommendations for repeated injections when patients' pain invariably "returned" a few days or weeks later.

165.   As an example of a fabricated report of pain relief, Michigan Pain claimed that S.T. (Claim No. 0670101484) had 0/10 pain after bilateral sacroiliac joint injections and a caudal epidural on November 28, 2022.

166.   S.T.'s case manager, who was at the appointment and who made a separate contemporaneous record, recorded that S.T. had only a 50% reduction in pain after the alleged injections.

167.   Further, the case manager also recorded that S.T. called her two (2) days later on November 30, 2022 to state that the injections "only provided very minimal relief," which would have been a clear signal that further injections were futile if properly recorded by Michigan Pain.

168.   Instead, Michigan Pain continued to recommend excessive injections to S.T. (as addressed further below) to the point that S.T. eventually demanded a written explanation from Michigan Pain of how the number of injections it was recommending and billing could be considered safe.

169.   The defendants also falsified patient signatures on records such as order forms for testing, including for urine drug testing ordered by the defendant clinics and billed by Laboratory Specialists, and on Assignment of Rights forms.

170.   For example, as discussed previously, E.S. (Claim No. 0569368137), who denied providing a urine sample at Michigan Pain and denied that the signature on a urine drug testing order form submitted to Allstate with the defendants' billing was his, also testified that the signature on a purported "Assignment of Rights" to Laboratory Specialists was not his signature.

171.   The defendants also fabricated records for alleged LINT and TPII services, as records submitted for specific services do not have any relation to the actual patients at issue.

172.   For example, Michigan Pain submitted a record purporting to document LINT and TPII to S.T. (Claim No. 0670101484) on January 18, 2023 but the record states that the service was rendered at an address in Spain, evidencing that it was nothing more than a template that did not actually document treatment to S.T.

173.   Testing, treatment, and services ordered and billed by the defendants that are based on falsified medical records and not on the patient's actual condition cannot be considered medically necessary and Allstate is entitled to restitution of all amounts it paid to the defendants for medical services ordered on the basis of the defendants' falsified medical records and reports.

## VIII.  UNLAWFUL AND UNLICENSED TREATMENT AND SERVICES

174.   The defendants violated several Michigan laws and regulations in their effort to bill Allstate as much as possible, including laws and regulations requiring licensure for the lawful provision of medical treatment and services.

175.   In order to legally issue DME in Michigan, a provider must obtain a license from the Michigan Board of Pharmacy.

176.   A license from the Michigan Board of Pharmacy is required for all "drugs **and devices** manufactured, distributed, prescribed, dispensed, administered, or issued in this state . . . ."  Mich. Comp. Laws § 333.17722 (emphasis added).

177.   Both Michigan Pain and Dearborn Pain routinely billed Allstate for purportedly dispensing and issuing DME to patients.

178.   The defendant clinics never possessed a valid license to issue DME in the State of Michigan at any time relevant to this action.

179.   Despite having no license to issue DME, since October 10, 2019, Michigan Pain has billed Allstate more than $64,030 for DME purportedly issued to at least 26 different patients. *See* Exhibit 1.

180.   Despite having no license to issue DME, since October 2, 2019, Dearborn Pain has billed Allstate more than $31,565 for DME purportedly issued to at least 18 different patients. *See* Exhibit 2.

181.   Because the defendant clinics did not possess a license to issue DME to patients, said DME was unlawful and not compensable under the No-Fault Act.

182.   Allstate is not required to pay the defendants for DME issued without a license and is entitled to restitution for payments it was induced to make by the defendant clinics' fraudulent bills.

183.   The defendants also billed for treatment that was determined, directed, and actually performed by unlicensed individuals.

184.   As noted above, the defendant clinics were operated and managed by Maffia, who is a layperson, and Jerome, who is a chiropractor but is not licensed in Michigan.

185.  Maffia and Jerome directed the evaluations, treatment, and testing billed by the defendants and, in some cases, actually performed alleged medical services.

186.  For example, on December 14, 2022, Michigan Pain billed for an evaluation of S.T. (Claim No. 0670101484) that it claimed was performed by Mustafa Shukr, M.D. ("Shukr").

187.  The case manager who accompanied S.T. to her appointment created her own record of the purported evaluation, and reported that S.T. was seen by Shukr's "assistant" named Dr. Jerome.

188.  Jerome has not had a license to practice any form of medicine in Michigan since at least 2014.

189.  Further, the case manager reported that Jerome counseled S.T. about undergoing further injections that S.T. was apprehensive about due to the number that had already been billed with no improvement.

190.  Even if Jerome were licensed in Michigan, he is a chiropractor who is not qualified to dispense medical advice about invasive injection therapies.

191.  Michigan Pain was clearly aware that Jerome should not have been making these medical recommendations to S.T. as it did not report that Jerome was involved with the purported evaluation at all on either its bill or record submitted to Allstate.

## IX.   UNREASONABLE      AND      UNNECESSARY      FRAUDULENT TREATMENT

192.   The defendants' willingness to falsify records and bill for services that were never rendered or that were rendered unlawfully demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

193.   The defendants' goal was to bill for as much treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills for submission to Allstate.

194.   To maximize their financial gain, the defendants adhered to a predetermined protocol of unnecessary, indiscriminate, and excessive treatment and testing, as discussed more fully below.

195.   The defendants' purported treatment violated standards of care in the medical community, as services were not indicated, redundant, excessive, and repeated without any benefit to patients.

196.   The full extent of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they billed was not known to Allstate until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

197.   The unnecessary treatment billed by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 3.

198.   All of the claims submitted by the defendants to Allstate through the U.S. Mail and interstate wires seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

199.   Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the defendants' fraud.

200.   None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate by the defendants.

## A.    THE DEFENDANTS' PREDETERMINED TREATMENT PROTOCOL

201.   Allstate's investigation uncovered a pattern of alleged diagnoses and treatment by the defendants that was applied uniformly to all patients who were claimed to have been involved in motor vehicle accidents.

202.   The pattern of diagnoses and treatment implemented by the defendants with respect to motor vehicle accident patients was characterized by (1) routinely recording substantially similar generalized complaints of non-specific alleged pain,

(2) highly similar evaluations and diagnoses across patients beginning at the patients' initial evaluation and continuing throughout frequent re-evaluations ordered by the defendants for each patient, (3) using cut-and-pasted verbiage in records submitted to Allstate to create the appearance of significant injuries to justify billing and further medical treatment, (4) providing mirrored treatment plans including recommendations for immediate resort to multiple injections and procedures and continuously recommending and pressuring patients to undergo additional injections throughout their treatment period, (5) ongoing orders for follow up examinations, physical therapy, and for a variety of medications, including prescriptions for opiate medications, and (6) frequent orders for urine drug testing that was not used to guide patient treatment.

203. The defendants' treatment protocol began with an initial patient evaluation billed by Michigan Pain or Dearborn Pain at which patients were reported to be experiencing pain and muscle spasms in various areas of the back and neck and often one or more extremity, followed by frequent and ongoing re-evaluations – often occurring monthly or even more frequently – at which the defendant clinics continued diagnosing the same set of complaints and conditions without basis.

204. Indeed, the defendants continued to diagnose the same conditions and recommend the same course of treatment even when patients reported they were no longer experiencing symptoms.

205.   For example, H.O. (Claim No. 0595915901) was diagnosed by Dearborn Pain with neck pain, low back pain, headaches, and rib pain, and Dearborn Pain proceeded to bill for numerous different injections, including both cervical medial branch block injections and epidural steroid injections, over a period of more than eight (8) months, and recommended H.O. undergo both lumbar and cervical radiofrequency ablation procedures to address her alleged pain complaints.

206.   At a follow up examination on May 24, 2021, H.O. reported she was experiencing no neck pain, yet Dearborn Pain still planned to schedule H.O. for both cervical and lumbar radiofrequency ablation procedures and failed to address H.O.'s report that she was no longer experiencing any neck pain.

207.   Similarly, A.S. (Claim No. 0650992894) clearly and repeatedly reported to Michigan Pain that he had no spinal pain at all, but Michigan Pain continued recommending at each appointment that A.S. subject himself to an experimental discogram procedure to be administered by Padula.

208.   Based on vague and unsupported diagnoses, the defendant clinics routinely recommended patients undergo multiple injections, often just days after alleged motor vehicle accidents, before patients had attempted any conservative treatment, and before normal and expected muscle pain could possibly resolve on its own, which is well below the standard of care for medical professionals.

209. The defendants' predetermined treatment protocol also included prescriptions for a standard package of medications, typically including prescriptions for opioids such as Norco, that were supplied by a pharmacy associated with the defendant clinics, and that were automatically refilled at follow-up appointments without evaluating the effectiveness of those medications.

210. Prescriptions, particular those for opioids such as Norco, were used by the defendants to induce patients to agree to injections and other treatment billed by the defendants, since the continuation of the prescriptions were tied to patients agreeing to the other treatment pressured by the defendant clinics.

211. Indeed, the defendants provided refills to patients who accepted their treatment demands, including for opioid medications, even when there was reason to believe the medications were being misused or diverted, further proving that they were prescribed as a way to generate billing and not based on medical necessity.

212. For example, Michigan Pain provided D.J. (Claim No. 064359217) with numerous refills of a Norco prescription, including monthly refills from at least January 2022 through September 2022, even though multiple urine drug tests during that period, including in June, July, and August of that year, found no evidence of opiates in D.J.'s system, indicating he was not taking those medications and that they were possibly being diverted.

41

213.   Michigan Pain never noted the negative test results in its evaluation reports and never expressed any concern with continuing to provide D.J. with refills of the Norco prescription during this period.

214.   Another aspect of the predetermined treatment protocol was orders for both presumptive urine drug testing and comprehensive panels of definitive urine drug testing from defendant Laboratory Specialists for nearly every patient at every appointment.

215.   Urine drug testing was ordered for patients regardless of what medications were prescribed and without regard to any risk of abuse or diversion as noted above, and the results of the urine drug testing was invariably ignored in determining patients' course of treatment, confirming that the urine drug testing had no clinical utility and was not necessary.

216.   The purpose of urine drug testing and other types of testing ordered by the defendants simply was to generate additional billing, as testing was ordered whether or not it was clinically indicated and was not used to guide patient treatment.

217.   For example, urine drug testing ordered by Michigan Pain and billed by Laboratory Specialists on August 30, 2020 with respect to D.R. (Claim No. 0646834325) was negative for opiates even though Michigan Pain was prescribing D.R. the opiate medication Norco.

218.   At D.R.'s next evaluation at Michigan Pain a month later, on September 28, 2022, Michigan Pain made no mention of the negative urine drug testing result, and continued to prescribe Norco.

219.   Similarly, Michigan Pain ordered and Lab Specialists billed for urine drug testing of specimens allegedly provided by A.S. (Claim No. 0650992894) every month throughout his purported treatment during which time he was regularly prescribed Norco by Michigan Pain.

220.   On October 28, 2022, the test results revealed the presence of cocaine in addition to hydrocodone (the opiate ingredient of Norco), but Michigan Pain simply noted that a urine screen had been performed and did not address this evidence of drug abuse at all.

221.   The following month, on November 28, 2022, a urine specimen provided by A.S. was negative for all substances, including hydrocodone (the opiate ingredient of Norco), which again was not addressed by Michigan Pain at all.

222.   For many patients, the defendants' predetermined protocol with respect to urine drug testing could not have even been intended to have any impact on patient care.

223.   For example, Michigan Pain began prescribing S.J. (Claim No. 0586188757) with Norco on October 20, 2020, and began ordering serial urine drug testing from Lab Specialists on the same date.

43

224.   The requisition/prescription form used by Lab Specialists at the time allowed the physician to order that hydrocodone be included in its urine screens, but the reports of the tests it claimed to perform did not actually include hydrocodone.

225.   In other words, the defendants had physicians sign pre-printed template forms that included drugs that were not actually part of the battery of tests done by Laboratory Specialists, and the omitted drug (hydrocodone) was the one drug susceptible to abuse that was regularly prescribed by Michigan Pain.

226.   The defendants' predetermined treatment protocol also included continuous and ongoing physical therapy referrals and orders for DME, allegedly supplied by Michigan Pain or Dearborn Pain, typically consisting of braces and supports, such as lumbar braces and knee braces.

227.   The defendants' orders for DME and physical therapy were not based on adequate medical findings, but were ordered as a matter of course as part of their predetermined treatment protocol.

228.   As discussed herein, much of the DME billed by the defendants was not proper for the medical conditions diagnosed by the defendant clinics, further proving that these items were ordered as part of the defendants' predetermined treatment protocol and not based on medical necessity.

**B.** **EXCESSIVE AND UNNECESSARY INJECTIONS**

229.   The defendants subjected patients to a battery of excessive and unnecessary injections and injection-related services, including multiple facet block injections, epidural steroid injections, and trigger point injections.

230.   The performance of invasive procedures, including injections, must be based on legitimate medical necessity.

231.   As discussed above, examinations billed by the defendants, if they took place at all, resulted only in boilerplate findings and treatment plans that were not adequate to support the performance of invasive procedures.

232.   Despite this, the defendants pushed patients to undergo injections even when the patient had not yet attempted conservative treatment and where there had not been sufficient time since the patient's accident to permit the normal and expected minor pain and soreness from the accident to resolve, contrary to the accepted standard of care.

233.   For example, D.W. (Claim No. 0581232303) was allegedly involved in a motor vehicle accident on December 6, 2019, and underwent an initial evaluation at Michigan Pain just three (3) days later, on December 9, 2019.

234.   The "Assessment" portion of Michigan Pain's report for D.W. consisted only of question marks:

---

**Assessment**

Injuries as a result of motor vehicle accident.

1. ??
2. ??
3. ??
4. ??.

---

235.   Despite failing to diagnose any specific injuries or conditions, and even though D.W.'s accident had occurred only three (3) days earlier and normal and expected minor pain and soreness could not have resolved at that time, Michigan Pain recommended and billed for trigger point injections and a bilateral sacroiliac injection on the same day as D.W.'s initial evaluation.

236.   As another example of the defendants' immediate and improper resort to invasive injections, Dearborn Pain billed Allstate by U.S Mail for an initial evaluation of patient J.B. (Claim No. 0630848844) on August 11, 2020, less than one (1) month after J.B.'s alleged motor vehicle accident.

237.   Despite noting that J.B. had not yet even attempted physical therapy and diagnosing only sprains and strains in the lumbar spine and sacroiliac joint, Dearborn Pain immediately recommended, and billed for allegedly performing that day, a bilateral sacroiliac joint injection.

238.   Moreover, the defendants routinely billed for so many multiple, overlapping injection procedures that it was impossible to obtain any diagnostic information from treatment that could be used to guide future treatment.

239. Even when the injections did provide diagnostically relevant information, the defendants ignored that information and instead persisted in recommending that patients undergo additional rounds of injections to generate bills for submission to Allstate.

240. The defendants frequently and consistently ordered repeat injections without analyzing the efficacy of prior procedures, in derogation of established standards of care.

241. Consequently, patients received unjustified invasive procedures that offered little therapeutic efficacy while subjecting the patients to unnecessary risks of infection and the risks associated with anesthesia.

242. Even in those instances where patients reported that injections were not helpful, and even when they reported the injections were harmful, the defendants nonetheless pressured patients to agree to additional injections as discussed herein.

243. The defendants' practice of pressuring patients to submit to injections immediately following an accident and to continue receiving injections even when prior injections proved ineffective or harmful resulted in injections that were medically unnecessary, excessive, and dangerous.

## 1. Excessive and Unsupported Injections

244. The defendants recommended numerous injections to almost every patient at almost every visit, often pressuring patients to undergo multiple injections

beginning at the initial patient visit (even when an initial visit occurred almost immediately after the patient's accident, as discussed above), as each such procedure generated additional charges to Allstate.

245.   The defendants' orders for injections were not based on appropriate clinical findings of ongoing symptoms that did not respond to conservative treatment, and injections frequently were recommended even when patients' reports of pain and diagnoses changed from one appointment to the next.

246.   The number and frequency of injections ordered by the defendants also far exceeded the standard of care for such procedures.

247.   As just one example of the defendant clinics' practice of billing excessive and unreasonable numbers of injections, Dearborn Pain billed for two rounds of cervical epidural steroid injections and two rounds of bilateral medial branch block injections at three (3) vertebral levels administered to patient G.E. (Claim No. 0633371422) in a period of just over two (2) months from November 11, 2021 through January 25, 2022.

248.   The injections allegedly performed on G.E. were contrary to standards of care, including because (1) there was no medical basis for ordering two different types of injections that were intended to treat different conditions, (2) repetition of the injections was not supported by sufficient clinical findings, and (3) the performance of so many injections over such a short period of time was contrary to

established guidelines, including that patients should receive no more than three procedures in twelve (12) weeks per region, with at least fourteen (14) days between injections.

249.   As in the above example, the defendants frequently alternated between recommending, and billing for, different types of injections to the same areas of the body but that are intended to address different conditions without any explanation or medical justification and solely to generate additional billing with respect to each patient.

250.   For example, without any justification or explanation, the defendant clinics often alternated from one appointment to the next between medial branch block injections, which are used to diagnose and treat localized back pain that does not radiate to the extremities, and epidural steroid injections, which are a possible treatment for radiating back pain in patients who are diagnosed with radiculopathy.

251.   As one example of this practice, Dearborn Pain reported on June 23, 2021 that B.B. (Claim No. 0628529711) was experiencing localized, episodic low back pain that B.B. rated just a four (4) on a scale of one (1) to ten (10).

252.   Despite the report of just localized pain, Dearborn Pain billed that day for a lumbar transforaminal epidural steroid injection ("TFESI"), which is a possible treatment for radicular pain, not localized pain.

253.   To justify billing for the TFESI, the procedure report for the injection to B.B. falsely, and contradicting the examination report from the same date, claimed that the reason for the procedure was a diagnosis of "lumbar radiculopathy."

254.   Just two (2) weeks later, at B.B.'s next examination on July 7, 2021, Dearborn Pain recorded conflicting reports that B.B. claimed her lower back pain had now increased to a seven (7) out of ten (10), and that B.B. reported the TFESI injection had alleviated her pain "for about three (3) weeks," which was temporally impossible since the injection had occurred only two (2) weeks earlier.

255.   Dearborn Pain made no attempt to resolve the conflicting reports, and instead proceeded to bill for lumbar medial branch block injections that same day, while now stating in the procedure report that B.B. was suffering from "lumbar facet mediated pain," not the radiculopathy it had reported two (2) weeks earlier.

256.   Further demonstrating the defendants' disregard of patients' actual medical condition, despite the failure of the initial TFESI injection, and the explicit report by B.B. that her pain had increased just two (2) weeks after the injection (meaning B.B. certainly had not experienced a reduction in pain of greater than 50% for at least six (6) weeks after the injection, which is the standard of care), Dearborn Pain inexplicably repeated the TFESI injection on September 17, 2021, less than three (3) months after the first failed injection.

257.   As another example, Dearborn Pain claimed that C.T. (Claim No. 0643439078) was experiencing radicular lumbar pain, and billed for TFESI injections on March 16, 2021, June 25, 2021, and September 24, 2021, diagnosing her with lumbar radiculopathy on each occasion.

258.   Dearborn Pain repeated these injections despite finding no significant, long-term benefit from the earlier injections.

259.   Indeed, at an evaluation on May 13, 2021, C.T. reported that she was still experiencing lumbar pain that was an 8-9 out of 10.

260.   Moreover, despite continuing to report radicular pain, on the same day as the May 13, 2021 evaluation, Dearborn Pain billed for lumbar medical branch block injections, which are not intended as a treatment for patients with radiculopathy.

261.   In an attempt to justify billing Allstate for the May 13 injections, the procedure report for the medial branch block injections falsely states that the reason for the injections was a diagnosis of "lumbar facet mediated pain."

262.   The defendant clinics' practice of indiscriminately recommending and billing for injections without regard to patients' actual condition resulted in billing for hundreds of injections that were not medically necessary.

### 2.     Unnecessary Trigger Point Injections

263.   One type of injection frequently billed by the defendant clinics were trigger point injections ("TPI").

264.   According to Official Disability Guidelines ("ODG"), trigger point injections with a local anesthetic may be indicated for the treatment of myofascial pain syndrome when certain criteria are met, including (1) the persistence of pain symptoms for more than three months, (2) failure to control symptoms through medical management such as stretching exercises, physical therapy, NSAIDs, or muscle relaxants, and (3) the absence of radicular symptoms.

265.   The defendant clinics routinely billed for TPI in violation of these standards, including by immediately billing for TPI following patients' alleged accidents and prior to the failure of medical management of the condition.

266.   For example, Michigan Pain billed for TPI to A.T. (Claim No. 0592547961) on March 9, 2020, just two (2) days after her alleged motor vehicle accident, which was contrary to the standard of care for administering TPI.

267.   As another example, Dearborn Pain billed for TPI to H.A. (Claim No. 0591432406) on June 25, 2020, less than one (1) month after H.A.'s alleged motor vehicle accident, in violation of the standard of care.

268.   The defendants also billed for medically unnecessary TPI by improperly repeating these injections.

269.   Applicable guidelines provide that TPI should only be repeated if the initial injections resulted in greater than 50% pain relief for at least six (6) weeks after the injection and there is documented evidence of functional improvement.

270.   Contrary to these guidelines, Michigan Pain and Dearborn Pain frequently billed for repeated TPI without documenting any improvement or that patients experienced greater than 50% pain relief for at least six (6) weeks.

271.   For instance, Michigan Pain billed for an alleged TPI to S.T. (Claim No. 0670101484) on November 15, 2022, and then did so again just one (1) month later, on December 14, 2022, despite the fact that S.T. could not possible have experienced six (6) weeks of pain relief at that time and without Michigan Pain making any findings of functional improvement as a result of the initial injection.

272.   As another example, Michigan Pain billed for alleged bilateral trapezius trigger point injections with respect to D.H. (Claim No. 0575041157) on four (4) dates over a four (4) month period, and on seven (7) total dates in less than one (1) year.

273.   Throughout that period, Michigan Pain never assessed whether the injections were beneficial or effective, and continued to bill for injections even though D.H. reported no significant pain reduction from injections, and often reported higher levels of pain than he was experiencing before the injections.

### 3.   Unnecessary and Medically Improper Medial Branch Block Injections

274.   According to ODG guidelines, medial branch block injections may be considered to be a necessary and medically appropriate treatment for back pain when pain is localized and there is the absence of radicular pain, spinal stenosis, previous fusion (same level), infection, tumor, or coagulopathy.

275.   In violation of these guidelines, the defendant clinics regularly billed for medial branch block injections for patients experiencing radicular pain and for whom the defendant clinics diagnosed radiculopathies.

276.   As one instance of this improper practice, Michigan Pain examined S.T. (Claim No. 0670101484) and claimed that she was experiencing low back pain that radiated into the left lower extremity.

277.   Despite this claim of radiating pain, on November 15, 2022, Michigan Pain billed for lumbar medial branch block injections on S.T. that were not medically warranted or appropriate.

278.   Demonstrating that Michigan Pain knew that the medial branch block injections were not medically supported, less than two (2) weeks later, on November 28, 2022, it billed Allstate for allegedly administering an epidural steroid injection to S.T., diagnosing her with lumbar radiculopathy at that time.

279.   As another example, Dearborn Pain billed for an initial evaluation of M.B. (Claim No. 0627954761) on June 29, 2021, and noted complaints of neck pain

"that radiates across his traps with occasional shooting pain down the right arm," as well as low back pain "that shoots down the [bilateral] legs."

280.   Despite the findings of both cervical and lumbar radicular pain, Dearborn Pain billed for alleged cervical medial branch blocks on M.B. that same day, and then billed for lumbar medial branch blocks just a week later, on July 7, 2021.

281.   At an evaluation on July 22, 2021, M.B. reported his neck and lumbar pain was as bad as or slightly worse than before the injections, and Dearborn Pain then diagnosed M.B. with lumbar radiculopathy before billing for a caudal epidural steroid injection that same day.

282.   Inexplicably, Dearborn Pain then repeated the lumbar medial branch block injections just a week later, on July 28, 2021.

283.   There was no possible medical rationale for repeating the medial branch block injections on M.B. given the failure of the previous injections and the diagnosis of radiculopathy just a week earlier.

284.   If they actually occurred at all, the medial branch block injections billed by Dearborn Pain were ordered solely to increase the amount it was able to bill to Allstate.

285.   As yet another example, Michigan Pain billed for allegedly fusing K.B.'s (Claim No. 0472636497) cervical spine on November 17, 2020 and lumbar spine on January 17, 2021.

286.   Despite clearly being aware of K.B.'s history of a fused spine, Michigan Pain proceeded to bill for alleged facet injections to both her cervical and lumbar areas on numerous dates over the next two (2) years, including at the same vertebral levels that were fused, which is clinically pointless.

287.   Further, Michigan Pain repeatedly noted that K.B. should undergo radiofrequency ablations – meaning that it understood that it had obtained the diagnostic information that facet injections were intended to provide – but that it was unable to figure out how to rent the equipment to perform the procedure.

288.   Rather than referring K.B. to a different physician for the procedure that Michigan Pain knew K.B. should undergo, it continued to bill for additional facet injections that served no purpose other than to generate additional bills.

### 4.   Excessive and Unnecessary Epidural Steroid Injections

289.   As previously described, the defendant clinics routinely pressured patients to undergo epidural steroid injections throughout their treatment as part of their predetermined treatment protocol and did so whether or not such injections were medically justified and even when prior injections proved ineffective and harmful.

290.   It was standard practice for the defendants to recommend a series of epidural steroid injections for patients, which is contrary to the standard of care since patients should be evaluated after each epidural steroid injection and additional injections only performed when previous injections prove effective.

291.   Repetition of epidural steroid injections is not recommended if there is an inadequate response to the first injection, with an adequate response defined as pain relief and improved function of at least 50% for a minimum of two (2) to three (3) weeks.

292.   Contrary to these standards, the defendant clinics routinely billed for repeated epidural steroid injections without documenting an adequate response to previous injections, and even when prior injections resulted in no improvement or actually made patients worse.

293.   As just one example of this practice, Michigan Pain billed for a cervical epidural steroid injection to S.T. (Claim No. 0670101484) on November 15, 2022.

294.   Less than one (1) month later, Michigan Pain billed for a second cervical epidural steroid injection to S.T., but made no findings or assessment that the initial injection was effective or that S.T. had experienced any relief for the appropriate period of time, meaning there was no medical basis for repeating the injection.

295.   Injections that are ordered as part of a predetermined protocol and not based on the patient's condition are medically unnecessary and not compensable under the No-Fault Act.

### C.   UNNECESSARY TPII AND LINT

296.   Defendants Michigan Pain and Dearborn Pain billed for purported TPII and LINT that was medically unnecessary.

297.   The defendant clinics began billing for TPII and LINT because they believed they could continue to demand unlimited and uncapped benefits from insurers like Allstate despite the No-Fault Act's implementation of a statutory fee schedule by billing for purported services that are not covered by Medicare's or the No-Fault Act's fee schedule because they are experimental, unproven, and unnecessary.

298.   These alleged treatments consisted of nothing more than purporting to identify and attempting to relieve trigger points, which are discrete, focal, irritated spots in a skeletal muscle, through electrical stimulation, and are the same services typically billed by physicians, chiropractors, and physical therapists for a small fraction of the amount billed by the defendants, and which services would have been subject to Michigan's No-Fault Act's fee schedule if billed as such.

299.   Trigger points are easily identified by routine manual evaluations, and can be and routinely are addressed with simple treatments such as massage,

application of cold packs, application of hot moist packs, ultrasound, electrical muscle stimulation, acupuncture, trigger point injections, and a variety of other methods.

300.   There is no evidence that LINT provides any therapeutic benefit beyond traditional methods of chiropractic treatment and physical therapy.

301.   The purported TPII and LINT services were allegedly done using equipment called Nervomatrix machines.

302.   Nervomatrix machines were approved for use by the Food and Drug Administration ("FDA") as a transcutaneous electrical nerve stimulation ("TENS") device.

303.   TENS treatment and devices are routine procedures that are covered by the No-Fault Act's fee schedule and paid at a tiny fraction of the amount billed by the defendant clinics.

304.   To the extent TPII and LINT treatment serves any medical purpose at all, it is used for the treatment of patients diagnosed with myofascial pain syndrome, which refers to a muscular pain disorder.

305.   Despite this, the defendant clinics billed for TPII and LINT with respect to patients who were not diagnosed with myofascial pain and without establishing any other medical basis for such treatment.

306.   Each time the defendant clinics claimed to render TPII and LINT services, they typically charged in excess of $6,000 for these experimental, unproven, and medically unnecessary procedures.  *See* Exhibits 1 and 2.

307.   As one example of the defendants billing for unnecessary TPII and LINT, Michigan Pain billed Allstate $6,150 for alleged TPII and LINT administered to the lumbar region of D.J. (Claim No. 0643459217) on September 12, 2022.

308.   Michigan Pain's evaluation report for D.J. on September 12, 2022, however, diagnosed D.J. with lumbar facet arthropathy, a form of arthritis affecting joints in the spine, not with myofascial pain, meaning there was no medical basis for the TPII and LINT services.

309.   At the time it allegedly performed the TPII and LINT, Michigan Pain already had billed for multiple rounds of lumbar facet joint injections to D.J., further proving that it did not believe he was experiencing myofascial pain syndrome and that it ordered the treatment solely to generate additional billing.

310.   As another example, Michigan Pain billed for lumbar TPII and LINT service on March 20, 2023 with respect to T.D. (Claim No. 0663896560) despite finding on that date and at earlier evaluations of T.D. that she was experiencing radicular lumbar pain, not myofascial pain, and had "significant facet arthropathy" for which she was scheduled to undergo surgery with another physician.

311.   Based on this diagnosis, there was no medical basis for the TPII and LINT service billed by Michigan Pain, which also billed for an alleged lumbar ESI on the same date as the alleged TPII and LINT.

### D.   UNNECESSARY DRUG TESTING

312.   Defendants Michigan Pain and Dearborn Pain routinely ordered, and Laboratory Specialists billed for, urine drug testing with respect to the patients at issue in this Complaint as part of their predetermined treatment protocol that was not medically necessary and was not used to guide patient treatment.

313.   The extent of the relationship between the defendant clinics and Laboratory Specialists is their common ownership (defendant Padula) and is further demonstrated by the fact that of 45 patients for whom Michigan Pain has billed Allstate since September 25, 2019, Laboratory Specialists has billed for urine drug testing with respect to 37 of those same patients, constituting an 82% overlap.

314.   Similarly, of 69 patients for whom Dearborn Pain has billed Allstate since September 25, 2019, Laboratory Specialists has billed for urine drug testing with respect to 53 of those patients, constituting a 76.8% overlap.

315.   Defendants Michigan Pain and Dearborn Pain ordered urine drug testing from Laboratory Specialists at rates that far exceeded medical standards of care, and was ordered solely as a way to generate additional billing to Allstate by Laboratory Specialists.

316.   Urine drug tests that have no bearing on patients' treatment are clinically useless and not medically necessary, and are therefore not compensable under the No-Fault Act.

### 1.   Michigan Pain and Dearborn Pain Ordered Urine Drug Testing in Violation of Standards of Care

317.   Urine drug testing is only properly used in the context of pain management treatment when it is random and designed to ascertain whether patients are abusing or diverting potentially dangerous medications.

318.   Guidelines published by the Centers for Medicare and Medicaid Services ("CMS") for the proper use of presumptive urine drug testing performed in the context of a physician prescribing opioid medications to treat patients for chronic pain advise that testing may be appropriate to monitor for issues such as substance abuse disorder, medication adherence, diversion, efficacy, and side effects, and provide that in order to establish the medical necessity for such testing, specific elements must be established during a clinical assessment and documented in the patient's medical record including (1) patient history, physical examination, and previous laboratory findings, (2) the patient's current treatment plan, (3) a review of the prescribed medications, and (4) a risk assessment plan.

319.   According to CMS guidelines, a risk assessment plan must evaluate the patient's risk potential for abuse and diversion, and document that assessment, and categorize the patient as low risk, moderate risk, or high risk.

320.   The frequency of random testing for a given patient should depend on the provider's completed risk assessment of the patient.

321.   CMS guidelines provide that random testing of low-risk patients one (1) to two (2) times every twelve (12) months is appropriate, random testing of moderate risk patients one (1) to two (2) times every six (6) months is appropriate, and random testing of high-risk patients one (1) to three (3) times every three (3) months is appropriate.

322.   The Centers for Disease Control and Prevention ("CDC") guidelines on opioids for chronic pain recommend that "[w]hen prescribing opioids for chronic pain, clinicians should use urine drug testing before starting opioid therapy and consider urine drug testing at least annually to assess for prescribed medications as well as other controlled prescription drugs and illicit drugs."

323.   Contrary to these guidelines, the defendant clinics and Padula routinely ordered monthly urine drug testing for almost every patient, regardless of what medications, if any, the defendants prescribed, and without ever performing an appropriate risk assessment, resulting in excessive and unreasonable amount of testing

324.   As an example, Dearborn Pain ordered and Laboratory Specialists billed for both presumptive urine drug testing and comprehensive definitive drug testing with respect to H.O. (Claim No. 0595915901) on seventeen (17) dates over a

63

fifteen (15) month period between September 10, 2020 and December 20, 2021, a frequency of testing that far exceeds the recommended rate of testing for even patients at the highest risk of abuse.

325.   Despite this, Dearborn Pain never performed a risk assessment for H.O. or evaluated her likelihood of abuse or diversion of the medications being prescribed by Dearborn Pain before it began ordering monthly urine drug testing.

326.   In fact, even though it repeatedly ordered urine drug testing for H.O., Dearborn Pain never reviewed the results of that testing at H.O.'s monthly follow-up appointments, with each evaluation report instead utilizing identical stock language that a "[u]rine drug screen [was] completed"; "MAPS were reviewed and medication was discussed in detail with the patient"; and that "[t]he patient received the 'opioid start talking' form as well as the 'opioid overdose preventions toolkit.'"

327.   Even when H.O.'s urine drug testing produced unexpected results, Dearborn Pain never addressed those results or used the results to guide or alter its treatment recommendations, proving that such testing was ordered as part of a predetermined treatment protocol, not based on medical necessity and had no clinical utility.

328.   For example, after H.O. repeatedly – and expectedly since she was being prescribed Norco – tested positive for opiates, her November 16, 2021 drug test results were negative for any opiates, which is an unexpected result that could

indicate diversion of the medication by the patient or at least that the patient was not complying with the physician's treatment recommendations.

329.    Despite this unexpected result, at H.O.'s next appointment at Dearborn Pain on December 20, 2021, her physician, Mustafa Shukr, M.D., failed to address the unexpected result of the drug testing, and his report for that encounter simply includes the same stock language quoted above that was used in every other evaluation report for H.O., and recommends H.O. "[c]ontinue current pain regimen."

330.    The defendants also ordered and billed for frequent urine drug testing for patients who were not being prescribed opioids or other medications with a likelihood of abuse or diversion, and never identified any basis for such testing.

331.    For example, Michigan Pain ordered comprehensive presumptive and definitive drug testing with respect to W.E. (Claim No. 0556773315) on August 18, 2020, even though W.E. was not being prescribed any opioids or other narcotics.

332.    After Laboratory Specialists reported no positive tests or unexpected results for the August 18, 2020 sample, Michigan Pain still continued to order monthly urine drug testing for W.E. for each of the next four (4) months without ever identifying any reason for doing so.

333.    Unsurprisingly, the results of all of the testing with respect to W.E., who again was being prescribed no medications that were likely to be abused or diverted, were negative.

334.   Further demonstrating that the urine drug testing ordered by Michigan Pain and Dearborn Pain was not medically necessary, the testing the defendant clinics ordered was not random and was ordered far more frequently than recommended by the applicable medical guidelines for such testing described previously.

335.   Even though they never performed a risk assessment for patients for whom they prescribed opioids, or for any other patient, the defendant clinics routinely ordered urine drug testing at rates exceeding the recommended rate of testing for patients in the highest risk category for abuse or diversion.

336.   For many patients, the defendant clinics ordered testing at every patient visit, resulting in monthly or even bi-weekly testing even when the defendant clinics noted no risk factors for abuse or diversion and where their reports for the evaluation of those patients found no evidence of misuse.

337.   For example, Michigan Pain ordered, and Laboratory Specialists billed for, urine drug testing with respect to D.H. (Claim No. 0575041157) on at least fifteen (15) dates between March 2020 and December 2021 despite failing to perform any risk assessment and never noting any particular risk factors that would warrant testing at such a frequent rate.

338.   As another example, Michigan Pain ordered and Laboratory Specialists billed for urine drug testing with respect to H.D. (Claim No. 0583987367) on at least

nineteen (19) dates of service between March 2020 and January 2022, again without ever establishing any reason for such frequent testing.

### 2. Michigan Pain and Dearborn Pain Ordered Definitive Urine Drug Testing That Was Not Medically Necessary

339. The defendants also violated standards of care applicable to urine drug testing by invariably ordering both presumptive drug testing and comprehensive definitive drug testing (also known as confirmatory drug testing) for each patient at each visit, a practice that was improper even in those instances where there may have been a basis for some type of drug testing, because definitive drug testing should only be utilized after performing a presumptive drug screen and when that screening shows unexpected results, such as the presence of an illicit drug or a medication that was not prescribed.

340. This standard is documented by the Substance Abuse and Mental Health Services Administration ("SAMHSA"), a federal agency within the Department of Health and Human Services ("HHS") that sets guidelines for clinical drug testing federal programs, and states that "[i]n clinical settings, confirmation is not always necessary.  Clinical correlation is appropriate . . . .  In addition, a confirmatory test may not be needed; patients may admit to drug use or not taking scheduled medications when told of the drug test results, negating the necessity of a confirmatory test.  However, if the patient disputes the unexpected findings, a confirmatory test should be done."

341.   Thus, SAMHSA confirms that, at most, only unexpected presumptive drug testing results should be confirmed in the absence of a patient-specific decision otherwise from the treating provider.

342.   Contrary to this standard, Michigan Pain and Dearborn Pain routinely ordered up to 17 presumptive urine drug tests and simultaneously ordered comprehensive definitive drug testing of up to 58 different substances that Laboratory Specialists then billed for without regard to the results of the presumptive drug testing, and did so even when the presumptive drug testing was negative for all substances allegedly tested.

343.   The level of definitive testing Michigan Pain and Dearborn Pain ordered during routine evaluations following low-level motor vehicle accidents, and Laboratory Specialists billed for, significantly exceeded the level of definitive testing required by the Nuclear Regulatory Commission's ("NRC") policy on drug testing.

344.   Persons authorized to operate a nuclear power reactor under the scope of the NRC are required to submit to drug and alcohol testing as part of their continued duties.  10 C.F.R. § 26.31 (NRC's Fitness for Duty Program).

345.   The NRC mandates that "[s]pecimens that yield positive initial drug test results or are determined by initial validity testing to be of questionable validity

must be subject to confirmatory testing by the laboratory, except for invalid specimens that cannot be tested."  10 C.F.R. § 26.31(d)(3).

346.   The NRC defines "initial drug test" as "a test to differentiate 'negative' specimens from those that require confirmatory testing."  10 C.F.R. § 26.5.

347.   Thus, the NRC does not require that definitive testing be performed on negative screening (i.e., initial drug test) results for persons entrusted with operating nuclear reactors.

348.   Even when screens produce unexpected results, it is not proper to immediately refer a urine specimen for more extensive testing.

349.   Instead, the physician should discuss the unexpected results with the patient, and if the patient admits to drug misuse, further definitive testing is unnecessary.

350.   The defendant clinics ordered urine drug testing contrary to the guidelines and laws described above.

351.   The defendant clinics' practice of routinely ordering both presumptive drug testing and definitive urine drug testing, and Laboratory Specialists's practice of billing for both presumptive and definitive drug testing for every patient, was contrary to the applicable standard of care and unnecessary.

### 3.   Laboratory Specialists Billed for Urine Drug Testing in Violation of Standards of Care

352.   Laboratory Specialists routinely billed for urine drug tests that it knew were not ordered by Michigan Pain, Dearborn Pain, and other medical providers and for which no medical necessity was ever established.

353.   The automatic ordering of unnecessary drug testing was facilitated by the order forms Laboratory Specialists supplied to the defendant clinics and other medical providers that permitted the provider to order presumptive testing "for all drugs" as well as definitive testing "for all drugs" simply by checking a box for each type of testing, instead of requiring patient-specific orders for tests.

354.   Laboratory Specialists's template order form allowed providers simply to check a box that then allowed Laboratory Specialists to bill for dozens of different tests, with no information about why such testing was necessary or which tests were relevant to the patient's condition.

355.   Many of these template order forms had the box to order testing for all drugs pre-checked before it was even filled out by the referring physician.

356.   The use of predetermined panels of tests that are not specific to patient needs does not comply with the applicable standard of care for such testing.

357.   Per the CDC guidelines for practitioners prescribing opioids for chronic pain, the use of definitive testing should be done based on the need to detect specific

opioids not identified through screening or in the event of the presence of unexpected screening results.

358.   Clinicians should not test for substances for which results would not affect patient management or for which implications for management are unclear.

359.   Regulations require that all diagnostic testing must be ordered by the treating physician, must be patient specific, and must be utilized in medical management of the patient's specific problem.

360.   The government has expressly stated that it holds laboratories responsible for unnecessary testing and does not allow laboratories to blame excessive urine drug testing on the referring provider.  *See* 63 Fed. Reg. 45080 (Aug. 24, 1998).

361.   Further, the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") has stated that "[t]he laboratory should construct the prescription form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill."

362.   The Laboratory Specialists order form's use of a box for extensive panels of tests does not provide the required indication of the specific testing ordered by the practitioner, and was therefore improper.

71

363.   Use of a predetermined slate of tests is necessarily not patient-specific as the drugs/analytes to be tested are established prior to the patient's urine drug testing referral.

364.   By testing for the same exact substances for each patient, regardless of age, medications prescribed, comorbidities, or other factors, Laboratory Specialists knowingly billed for urine drug testing that could not have been medically necessary for each patient's individual medical condition.

365.   The OIG also guides that "[l]aboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable, and necessary for the beneficiary, given his or her clinical condition." *See* 63 Fed. Reg. at 45079.

366.   Instead of taking steps to ensure that it was only submitting claims for necessary drug testing, Laboratory Specialists intentionally worked to increase the number of medically unnecessary tests referred by physicians and billed to payors like Allstate.

367.   Frequently, Laboratory Specialists billed for allegedly testing for all of the drugs/analytes listed on its requisition/prescription form even when the physician clearly did not order all tests to be performed.

368.   For example, on October 13, 2020, Laboratory Specialists billed for alleged testing of a specimen from S.J. (Claim No. 0586188757) that included

separate charges for testing for the presence of MDMA, PCP, gabapentin, pregabalin, tramadol, muscle relaxants, and antidepressants, all of which have boxes on the requisition/prescription form that were not checked by the referring physician.

369.   In addition to ignoring physicians' actual orders for what tests to perform, Laboratory Specialists also ignored other sections on its requisition/prescription forms that should have alerted it that the tests for which it billed were improper.

370.   For example, Laboratory Specialists's order form included a box for medical providers to list current medications being taken by the patient.

371.   Information about what medicines a patient was taking may have enabled Laboratory Specialists to make some determination of medical necessity in certain cases, but that information was routinely omitted and Laboratory Specialists still regularly billed for the ordered testing without requiring that information.

372.   For example, on December 29, 2020, Dearborn Pain ordered both presumptive urine drug testing and comprehensive definitive urine drug testing that was billed by Laboratory Specialists for H.A. (Claim No. 0591432406), just two (2) weeks after a previous order for the same testing returned uniformly negative results.

373.   At the time Laboratory Specialists received the December 29 order for the urine drug testing, H.A. was not being prescribed any controlled substances by Dearborn Pain, and the testing order form left the section for listing H.A.'s current

medications blank, meaning Laboratory Specialists had no possible basis for determining that testing, occurring just two (2) weeks after H.A.'s previous test, was medically necessary.

374.   Despite this, Laboratory Specialists billed Allstate for presumptive testing, which was again negative, and then also billed for unnecessary comprehensive definitive drug testing despite there being no unexpected test results to confirm.

375.   All of the definitive drug testing billed by Laboratory Specialists after a negative presumptive drug test result for the substance being tested for was medically unnecessary.

376.   Drug tests that were improperly ordered and medically unnecessary could not have been used to guide patient care.

377.   Allstate is not required to pay the defendants for drug testing that is redundant, not patient-specific, and that is unnecessary, and is entitled to a return of monies it paid to the defendants for these medically unnecessary drug tests.

**E.    UNNECESSARY DME**

378.   Michigan Pain and Dearborn Pain frequently billed for DME that was not appropriate for the medical conditions diagnosed and was simply ordered as part of the defendants' predetermined treatment protocol.

379.   One item frequently billed by the defendant clinics was a back brace using HCPCS code L0631, which refers to a "lumbarsacral orthosis, sagittal control, with rigid anterior and posterior panels, posterior extends from sacrococcygeal junction to T-9 vertebra, produces intracavitary pressure to reduce load on the intervertebral discs, includes straps, closures, may include padding, shoulder straps, pendulous abdomen design, prefabricated item that has been trimmed, bent, molded, assembled, or otherwise customized to fit a specific patient by an individual with expertise."

380.   Medical guidelines provide that the type of lumbar sacral orthosis billed using HCPCS code L0631 is only medically appropriate following a surgical stabilization such a lumbar fusion or other surgical stabilization of the spine following traumatic injury.

381.   Despite these guidelines, the defendant clinics regularly billed for such back braces for patients who had not undergone lumbar fusion surgery or a surgical stabilization of the spine.

382.   For example, Michigan Pain billed using HCPCS code L0631 for a back brace allegedly issued to patient S.T. (Claim No. 0670101484) on June 22, 2022, even though S.T. had not undergone any type of spinal stabilization surgery, and had only received a bilateral SI joint injection.

383.   DME that was unnecessary and improper for patients' condition is not compensable under the No-Fault Act.

384.   Allstate is not required to pay the defendants for DME that is unnecessary, and is entitled to a return of monies it paid to the defendants for medically unnecessary medical equipment.

## X.   FRAUDULENT BILLING PRACTICES

385.   The medical records, bills, and invoices submitted to Allstate by the defendants contained standardized billing codes.

386.   Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

387.   The defendants failed to meet this responsibility and instead submitted bills with unreasonable charges to Allstate for medically unnecessary, unlawful, and excessive services and used fraudulent billing practices, as discussed *infra*.

388.   All of the medical records, bills, and invoices submitted to Allstate by the defendants contained CPT and Healthcare Common Procedure Coding System ("HCPCS") codes.

389.   By utilizing CPT and HCPCS codes to submit billing to Allstate, the defendants represented that the services they billed for corresponded to and were

accurately described by the published descriptions for the CPT and HCPCS codes they chose.

390.   The defendants never communicated to Allstate that they intended that the CPT and HCPCS codes they used to submit bills have any meanings other than those ascribed by the American Medical Association ("AMA") and the Centers for Medicare and Medicaid Services ("CMS"), which publish CPT and HCPCS codes, respectively.

391.   Allstate reasonably relied on the representations and published definitions assigned to the CPT and HCPCS codes billed by the defendants.

392.   The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms (HICF) approved by the National Uniform Claim Committee (NUCC) and referenced in the NUCC Instruction Manual.

393.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

394.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

395.   The defendants knowingly submitted false, incomplete, and misleading bills to Allstate, including submitting bills that included inaccurate and inappropriate CPT and HCPCS codes for the services they allegedly provided, with the intention that Allstate rely on those bills in order to make payments to the defendants to which they knew they were not entitled.

396.   Allstate relied on the bills submitted by the defendants to its detriment and was induced to make payments to the defendants to which they were not entitled as a result of the defendants' fraudulent billing practices.

### A.   FRAUDULENT DOUBLE BILLING

397.   One way the defendants sought to and did obtain payments from Allstate to which they knew they were not entitled was by submitting double bills for the same alleged procedures, supplies, and services through the use of separate CPT codes and charges for individual components of a procedure that also were included in another billing code also billed for the same date of service.

398.   Defendants Michigan Pain and Dearborn Pain frequently double billed by submitting separate charges for services and supplies associated with injections that are included with the primary procedures billed.

399.   For example, both Michigan Pain and Dearborn Pain frequently billed CPT code 97010 for application of hot or cold packs on the same day they billed for injections and other procedures.

400.   According to billing guidelines, the application of a hot/cold pack is considered a part of whatever primary service is rendered to the patient, and can never be separately charged since it is being paid within another billing code.

401.   Another way the defendants sought to obtain payments from Allstate to which they were not entitled was by separately billing for supplies utilized in connection with injections that billing guidelines instruct are considered already included within the procedures.

402.   For example, Michigan Pain and Dearborn Pain frequently billed for surgical trays they allegedly used for injection procedures, which are considered a necessary component of the procedures billed on the same dates.

**B.   IMPROPER USE OF BILLING MODIFIERS**

403.   One way the defendants sought to disguise their fraudulent billing practices in order to induce Allstate to pay for services that they improperly billed was through the misuse of CPT code billing modifiers.

404.   CPT code modifiers are used to indicate to payors that a service or procedure has been altered by some specific circumstance.

405.   A billing modifier that the defendants frequently utilized to disguise their improper billing was CPT code modifier 25, which is used to report a separate and significant evaluation and management service provided on a day when another

service was provided to the patient by the same physician or other qualified health care professional.

406.   The defendants utilized CPT code modifier 25 in order to improperly bill for patient evaluations on the same date they billed for procedures such as injections.

407.   Billing guidelines for patients undergoing various, defined medical procedures, such as injections and surgeries, establish a global surgery "package" of components of a medical procedure that are included in the CPT billing code for the procedure, and includes all the necessary services normally furnished before, during, and after a procedure.

408.   These guidelines apply in any setting, including inpatient hospitals, outpatient hospitals, ambulatory surgical centers, and physician's offices.

409.   The global surgery package includes patient evaluations during a defined period of time before, on the day of, and after surgery based on the type of surgical procedure performed.

410.   Providers may not separately bill for the evaluation of a patient related to the procedure being performed if it occurs during the global surgery period.

411.   The guidelines establish three global surgery periods that apply to different types of procedures: a "zero-day" post-operative period for certain identified minor procedures, such as injections, that prohibits providers from billing

for a separate patient evaluation on the day of the procedure; a "10-day" post-operative period for other identified procedures that prohibits providers from billing for a separate patient evaluation on the day of the procedure and for ten (10) days immediately following the date of the procedure; and a "90-day" post-operative period for major surgeries that prohibits providers from billing for a separate patient evaluation one (1) day before the procedure, on the day of the procedure, and for 90 days immediately following the date of the surgery.

412.   Many of the injections and procedures billed by the defendants at issue in this litigation are included in the global surgery period, and typically fall within the "zero-day" post-operative period, meaning the defendants were prohibited from separately billing for evaluation and management of the patient on the day they received injections.

413.   In order to circumvent the limitation on billing for patient evaluations on the same day they billed for injections and other procedures, and in an attempt to fraudulently induce Allstate to pay them amounts to which they were not entitled, the defendants used CPT code modifier 25 to represent to Allstate that the evaluations billed on those days were separate and distinct from injections and other procedures billed on the same date.

414.   In fact, those evaluations were not separate and distinct from the injections and other procedures billed by the defendants, and the use of modifier 25 was fraudulent.

415.   As an example of this practice, Michigan Pain billed for evaluation and management with respect to patient D.J. (Claim No. 0643459217) on September 8, 2021 using CPT code 99213 and modifier 25 and billed for a right shoulder injection, bilateral SI joint injection, and trigger point injections, each of which are included in the "zero-day" post-operative period.

416.   The report for D.J.'s alleged evaluation on September 8, 2021 makes it clear that no separate and identifiable evaluation service was provided that day, and that the use of billing modifier 25 in Michigan Pain's billing was intended only to mislead Allstate, since the report is largely just cut-and-pasted from earlier evaluation reports for the patient.

417.   The defendants' improper use of billing modifiers was intended to and did induce Allstate to pay the defendants amounts to which they were not entitled.

## XI.   EXCESSIVE AND UNREASONABLE CHARGES

418.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

419.    The defendants knew that the amounts they billed Allstate were unreasonable at the time the charges were submitted and intentionally billed these excessive and unreasonable amounts as part and in furtherance of their scheme to defraud Allstate by inducing it to pay the defendants monies they were not entitled to receive.

420.    Part of the defendants' motivation to bill grossly excessive amounts was that they sold their accounts receivable to third-party factoring/funding companies for a percentage of the face value of the bill, which was a mere fraction of the amount they charged to Allstate.  Thus, the higher the amount of the bill (even with no basis in reality and even with no connection to the relative value of the service allegedly provided), the more money the defendants' percentage take was.

421.    These sale of accounts receivable contracts provided the defendants with a significant financial motivation to bill Allstate for as many purported services as possible – including through the billing for services not rendered, double billing, unnecessary treatment, unlicensed treatment, and fraudulent billing practices addressed above – and to charge unreasonable amounts for such purported services, to maximize the amount they would receive pursuant to the percentage-based contracts with the purchasers of their accounts receivable

422.    The potential of receiving a windfall to which they were not entitled by charging unreasonable and excessive amounts also motivated the defendants'

decision to bill Allstate for treatment not rendered and unlawful and unnecessary treatment, and was their motivation to resort to fraudulent billing practices as described *supra*.

423.   In each such case, including those described in the following subsections, Allstate was harmed when it was induced to pay the unreasonable amounts billed by the defendants.

424.   Allstate also was harmed even when it did not pay the unreasonable and excessive amounts charged by the defendants, because it was nevertheless obligated to investigate and adjust each insurance claim thereby incurring costs.

## A.   EXCESSIVE AND UNREASONABLE CHARGES FOR URINE DRUG TESTING

425.   Laboratory Specialists routinely billed Allstate for urine drug testing that was not medically necessary, and also charged excessive and unreasonable amounts for the urine drug testing it allegedly performed.

426.   Laboratory Specialists most often billed Allstate for presumptive drug testing using CPT code 80307, which refers to urine drug testing that is performed by instrument chemistry and analyzers (e.g., utilizing immunoassay, chromatography, and mass spectrometry either with or without chromatography).

427.   Laboratory Specialists regularly billed Allstate $1,200 for presumptive drug screens that took at most only a few minutes to conduct if they were performed at all.

428.    The payment rate established by CMS for a presumptive drug screening for up to nine (9) different substances is approximately $62 to $70, meaning the amount Laboratory Specialists billed Allstate was more than 1,600% higher than the amount Medicare pays for such testing.

429.    The amount billed by Laboratory Specialists for presumptive drug testing was excessive and unreasonable and Laboratory Specialists cannot sustain its burden of proving otherwise.

430.    Laboratory Specialists also billed excessive and unreasonable amounts for definitive drug testing.

431.    Under the fee schedule effective July 2, 2021 applicable to claims for payment under the No-Fault Act, definitive drug testing may only be billed one time for each date of service using HCPCS code G0483, not for each individual drug test.

432.    The No-Fault Act further provides that the amount billed for services with respect to which the fee schedule is applicable may be billed at no more than 200% of the amount payable by Medicare, which for clinical testing billed using HCPCS code G0483 was between $246.92 and $255.15 in 2022.

433.    Contrary to these billing guidelines, Laboratory Specialists routinely billed for each individual definitive drug test it allegedly performed, and did so because that allowed it to bill more than billing using the single HCPCS code G0483.

434.   By billing for each individual test, Laboratory Specialists repeatedly billed Allstate $2,285 or more for each date of service that it billed for definitive drug testing, which is more than four (4) time more that it could have charged if it had properly billed Allstate using HCPCS code G0483.

435.   Charges that are four (4) times more than the amounts permitted by Michigan law, and that are not submitted in accordance with guidelines established by the No-Fault Act, are necessarily unreasonable and Laboratory Specialists cannot prove otherwise.

### B.   EXCESSIVE AND UNREASONABLE DME CHARGES

436.   In addition to being unlicensed, medically unnecessary, and issued contrary to applicable standards of care, as discussed *supra*, the DME billed by Michigan Pain and Dearborn Pain was charged at unreasonable rates.

437.   As discussed above, the predetermined treatment protocol used by the defendants involved billing for the issuance of DME, including lumbar braces billed by Michigan Pain using HCPCS code L0631 as well as HCPCS code L0637, which describes a "lumbar-sacral orthosis, sagittal-coronal control, with rigid anterior and posterior frame/panels, posterior extends from sacrococcygeal junction to T-9 vertebra, produces intracavitary pressure to reduce load on the intervertebral discs, includes straps, closures."

438.   Michigan Pain has billed Allstate for this lumbar brace using HCPCS code L0631 at least twenty-five (25) times since September 25, 2019, and Dearborn Pain has billed using HCPCS code L0631 at least nine (9) times during that same period, with each billing Allstate $1,800 or more on each occasion.

439.   As previously discussed, there is no evidence that patients ever actually received these unnecessary back braces from the defendant clinics, but even if they were delivered to the patients, the amount charged by the defendants was at least two to four times the amount approved by CMS for DME that is properly billed utilizing HCPCS code L0631.

440.   Allstate is not required to pay for back braces and other DME fraudulently billed pursuant to a predetermined treatment protocol or for which it was charged more than reasonable and customary rates, and is entitled to the return of all sums paid due to the fraudulent issuance and billing of DME by Michigan Pain and Dearborn Pain.

### C.   EXCESSIVE AND UNREASONABLE CHARGES FOR INJECTIONS

441.   To the extent the injections and related procedures billed by the defendant clinics actually occurred, they routinely billed exorbitant and unreasonable amounts for those services.

442.   The following chart summarizes some of the most common procedures billed by the defendants during the relevant period, the average amounts they billed for those procedures, and the percentage markup over CMS payment rates:

| CPT Code | Description | Michigan Pain Average Charge | Dearborn Pain Average Charge | Average CMS Non-Facility Payment Amount in Michigan (2021) | Percent Markup |
|---|---|---|---|---|---|
| 20552 | Injection(s); single or multiple trigger point(s), 1 or 2 muscle(s) | $746 | $746 | $57.35 | 1,200% |
| 20610 | Arthrocentesis, aspiration and/or injection, major joint or bursa (eg, shoulder, hip, knee, subacromial bursa); without ultrasound guidance | $821 | $821 | $68.32 | 1,101% |
| 27096 | Injection procedure for sacroiliac joint, anesthetic/steroid, with image guidance (fluoroscopy or CT) including arthrography when performed | $2,161 | $2,161 | $172.98 | 1,238% |
| 62321-62323 | Injection(s), of diagnostic or therapeutic substance(s) | $4,355 | $4,355 | $227.78 | 1,800% |
| 64483-64484 | Injection of Anesthetic Agent, Diagnostic or Therapeutic | $2,943 | $2,943 | $180.72 | 1,500% |
| 64490-64495 | Injection(s), paravertebral facet joint | $2,700 | $2,700 | $133.32 | 1,900% |
| 77002-77003 | Fluoroscopic Guidance | $1,215 | $894 | $109.37 | 1,010% |

443. Charges that are more than 1000% higher than the payment permitted by Medicare cannot be considered reasonable.

444. Michigan Pain's and Dearborn Pain's charges for injections and procedures are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

## XII. MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A. MISREPRESENTATIONS BY THE DEFENDANTS

445. To induce Allstate to pay promptly their fraudulent charges, the defendants submitted to Allstate false documentation that materially misrepresented that the services they referred and billed for were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

446. Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

447. Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]." Mich. Comp. Laws § 500.3157(1).

448.   Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

449.   There are no less than eleven (11) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

a.   Michigan Pain, Dearborn Pain, and Laboratory Specialists routinely billed for services that were not performed at all.

b.   Michigan Pain, Dearborn Pain, and Laboratory Specialists falsified medical records to bill for services that were not performed and to create a false appearance of injury to justify excessive and unnecessary medical treatment and billing.

c.   The defendants illegally solicited patients for treatment they did not need and would not otherwise have sought but for the solicitation.

d.   The defendants used an improper predetermined treatment protocol, implemented by use of pre-printed, boilerplate, fabricated, and exaggerated purported examination findings, to order and bill for excessive injections, DME, urine drug testing, and other diagnostic testing and treatment.

e.   Michigan Pain and Dearborn Pain unlawfully billed for the purported issuance of DME without possessing the licensure required by the State of Michigan.

f.   Michigan Pain and Dearborn Pain ordered and pressured patients to undergo injections and procedures that were medically unnecessary and ordered in violation of applicable standards of care in furtherance of the scheme to bill Allstate as much as possible, and not based on the individual and actual needs of patients.

g.   Michigan Pain and Dearborn Pain pressured patients to undergo injections and procedures that were medically unnecessary and ordered in violation of applicable standards of care by improperly threatening to withhold medications and treatment from patients unless they agreed to undergo the injections and procedures the defendants pushed.

h.   Michigan Pain and Dearborn Pain ordered and Laboratory Specialists billed for urine drug testing that was medically unnecessary and ordered in violation of applicable standards of care in furtherance of the scheme to bill Allstate as much as possible, and not based on the individual and actual needs of patients.

i.   Michigan Pain and Dearborn Pain billed for DME that was medically unnecessary and ordered in violation of applicable standards of care in furtherance of the scheme to bill Allstate as much as possible, and not based on the individual and actual needs of patients.

j.   Michigan Pain and Dearborn Pain double billed Allstate by separately billing for patient evaluations, services, and medical supplies that were included in the primary procedure billed on the same date of service.

k.   Michigan Pain, Dearborn Pain, and Laboratory Specialists submitted bills at rates that had no basis and were many times higher than reasonable to charge for services, if such services were rendered at all.

450.   As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

451.   If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

452.   The foregoing facts – including billing for services not rendered, falsifying medical records, rendering treatment without a license, using a

predetermined treatment protocol to inflate charges, fraudulent billing practices, and misrepresenting the necessity of treatment and testing – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

453.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing by the defendants unnecessary and unlawful.

454.   The fact of unnecessary treatment is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 3.

455.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

456.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via faxes over interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, testing, procedures, urine drug testing, DME, and ancillary services for which they billed Allstate.

457.   As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

## B.   ALLSTATE'S JUSTIFIABLE RELIANCE

458.   The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

459.   At all relevant times, the defendants hid from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided and referred by them to prevent Allstate from discovering that the claims submitted by the defendants were not compensable under the No-Fault Act.

460.   These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek payment under Michigan's No-Fault Act.

461.   Evidence of the fraudulent scheme detailed in this Complaint was not discovered until Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

462.   Due to the defendants' material misrepresentations and other affirmative acts designed to hide their fraudulent scheme, Allstate did not and could

not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

463.   In reliance on and as a result of the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

464.   Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services billed.

465.   As a result, Allstate has paid hundreds of thousands of dollars to the defendants as a result of their false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XIII.   **MAIL AND WIRE FRAUD RACKETEERING ACTIVITY**

466.   As discussed above, the referrals, treatment, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

467.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 3, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

468.   This objective necessarily required the submission of bills for payment to Allstate.

469.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered to Allstate by the United States Postal Service or sent through faxes over interstate wires.

470.   All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled to Allstate through interstate wires or the U.S. Mail.

471.   All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Iowa.

472.   Allstate received all medical records and bills faxed to it by the defendants in Iowa.

473.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim, insurance payments, and the return of cancelled checks.

474.   It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

475.   Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

476.   The insurance fraud scheme detailed herein generated hundreds of mailings and faxes.

477.   A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 4.

478.   As detailed herein, the defendants also submitted medical documentation and claims for payment to Allstate via fax or mail related to each exemplar patient discussed in this Complaint.

479.   It was within the ordinary course of business for Michigan Pain, Dearborn Pain, and Laboratory Specialists (the "entity defendants") to submit claims for No-Fault payment to insurance carriers like Allstate through interstate wires and the U.S. Mail.

480.   Moreover, the business of billing for medical services by each of the entity defendants at issue herein is regularly conducted by fraudulently seeking payment to which each defendant clinic is not entitled through the use of fraudulent communications sent via intestate wires and the U.S. Mail.

481.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the defendants.

482.   The entity defendants, at the direction and with the knowledge of their owners and manager defendant Padula, continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

483.   Thus, the defendants' commission of mail and wire fraud continues.

484.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

485.   As the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

486.   Allstate reasonably relied on the submissions it received from the entity defendants, including the submissions set out in Exhibits 1 through 4 annexed hereto and identified in the exemplar claims above.

487.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of

the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIV.  __DAMAGES__

488.   The fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

489.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of half a million dollars that were paid to Laboratory Specialists, to Michigan Pain since September 25, 2019, and to Dearborn Pain since September 25, 2019.

490.   The payments that constitute Allstate's compensatory damages each derive from a check sent by Allstate through the U.S. Mail.

491.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

492.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

493.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XV.   CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Michigan Pain Enterprise)
### Against Dearborn Pain Specialists, PLLC, Laboratory Specialists of Michigan, LLC, and James Padula, D.O.

494.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 493 set forth above as if fully set forth herein.

495.   Michigan Pain constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

496.   In connection with each of the claims identified in the within Complaint, defendants Dearborn Pain, Laboratory Specialists, and Padula ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Michigan Pain, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Michigan Pain's business, or should have reasonably foreseen that the mailing and faxing of such false medical documentation by Michigan Pain would occur, in furtherance of the Count I defendants' scheme to defraud.

497.   The Count I defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 4.

498.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Michigan Pain, which they knew would be billed by Michigan Pain, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

499.   Padula owned, managed, and controlled Michigan Pain and was responsible for all actions taken by Michigan Pain and its staff.

500.   Laboratory Specialists was responsible for providing purported urine drug testing results for testing ordered by Michigan Pain that furthered and enabled Michigan Pain's efforts to create the appearance of medical necessity for its services and that allowed Michigan Pain to submit bills to Allstate for medically unnecessary services and treatment.

501.   Dearborn Pain assisted Michigan Pain in developing and implementing a predetermined treatment protocol that allowed Michigan Pain to submit billing for excessive, unnecessary, and improper medical services to Allstate and shared the use

of facilities, equipment, and staff with Michigan Pain that allowed it to carry out the fraudulent treatment and billing practices described herein.

502.   The Count I defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Michigan Pain to continue billing for unlawful and medically unnecessary treatment, if provided at all.

503.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Michigan Pain for the benefit of the Count I defendants that would not otherwise have been paid.

504.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

505.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Michigan Pain Enterprise)
### Against Dearborn Pain Specialists, PLLC, Laboratory Specialists of Michigan, LLC, and James Padula, D.O.

506.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 493 set forth above as if fully set forth herein.

507.   Defendants Dearborn Pain, Laboratory Specialists, and Padula ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Michigan Pain.

508.   The Count II defendants each agreed to further, facilitate, support, and operate the Michigan Pain enterprise.

509.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

510.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Michigan Pain even though Michigan Pain was not eligible to collect such payments by virtue of its unlawful conduct.

511.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

512.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

513.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Dearborn Pain Enterprise)**
**Against Michigan Pain Management PLLC, Laboratory Specialists of Michigan, LLC, and James Padula, D.O.**

514.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 493 set forth above as if fully set forth herein.

515.   Dearborn Pain constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

516.   In connection with each of the claims identified in the within Complaint, defendants Michigan Pain, Laboratory Specialists, and Padula ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Dearborn Pain, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Dearborn Pain's business, or

should have reasonably foreseen that the mailing and faxing of such false medical documentation by Dearborn Pain would occur, in furtherance of the Count III defendants' scheme to defraud.

517.   The Count III defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 4.

518.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Dearborn Pain, which they knew would be billed by Dearborn Pain, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

519.   Padula owned, managed, and controlled Dearborn Pain and was responsible for all actions taken by Dearborn Pain and its staff.

520.   Laboratory Specialists was responsible for providing purported urine drug testing results for testing ordered by Dearborn Pain that furthered and enabled Dearborn Pain's efforts to create the appearance of medical necessity for its services and that allowed Dearborn Pain to submit bills to Allstate for medically unnecessary services and treatment.

521.   Michigan Pain assisted Dearborn Pain in developing and implementing a predetermined treatment protocol that allowed Dearborn Pain to submit billing for excessive, unnecessary, and improper medical services to Allstate and made available the use of facilities, equipment, and staff to Dearborn Pain that allowed it to carry out the fraudulent treatment and billing practices described herein.

522.   The Count III defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Dearborn Pain to continue billing for unlawful and medically unnecessary treatment, if provided at all.

523.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Dearborn Pain for the benefit of the Count III defendants that would not otherwise have been paid.

524.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

525.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

526. The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

527. By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Dearborn Pain Enterprise)**
**Against Michigan Pain Management PLLC, Laboratory Specialists of Michigan, LLC, and James Padula, D.O.**

528. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 493 set forth above as if fully set forth herein.

529. Defendants Michigan Pain, Laboratory Specialists, and Padula ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Dearborn Pain.

530. The Count IV defendants each agreed to further, facilitate, support, and operate the Dearborn Pain enterprise.

531. As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

532. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Dearborn Pain even though Dearborn Pain was not eligible to collect such payments by virtue of its unlawful conduct.

533. The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of solicited patients and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

534. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein.

535. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Laboratory Specialists Enterprise)
### Against Michigan Pain Management PLLC, Dearborn Pain Specialists, PLLC, and James Padula, D.O.

536.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 493 set forth above as if fully set forth herein.

537.   Laboratory Specialists constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

538.   In connection with each of the claims identified in the within Complaint, defendants Michigan Pain, Dearborn Pain, and Padula ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Laboratory Specialists, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Laboratory Specialists's business, or should have reasonably foreseen that the mailing and faxing of such false medical documentation by Laboratory Specialists would occur, in furtherance of the Count V defendants' scheme to defraud.

539.   The Count V defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 4.

540.  As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical goods and services that were purportedly provided by Laboratory Specialists, which they knew would be billed by Laboratory Specialists in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

541.  Michigan Pain and Dearborn Pain were responsible for the orders for urine drug testing that allowed Laboratory Specialists to submit bills to Allstate for medically unnecessary urine drug testing.

542.  Michigan Pain and Dearborn Pain billed Allstate for medically unnecessary treatment that was used to falsely create the appearance that the urine drug testing billed by Laboratory Specialists was medically necessary.

543.  Padula owned, managed, and controlled Laboratory Specialists and was responsible for all actions taken by Laboratory Specialists and its staff.

544.  The Count V defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Laboratory Specialists to continue to bill for unlawful and medically unnecessary urine drug testing, if performed at all.

545.  As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

payment drafts to Laboratory Specialists for the benefit of the Count V defendants that would not otherwise have been paid.

546.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

547.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Laboratory Specialists Enterprise)
### Against Michigan Pain Management PLLC, Dearborn Pain Specialists, PLLC, and James Padula, D.O.

548.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 493 set forth above as if fully set forth herein.

549.   Defendants Michigan Pain, Dearborn Pain, and Padula ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Laboratory Specialists.

550.   The Count VI defendants each agreed to further, facilitate, support, and operate the Laboratory Specialists enterprise.

551.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

552.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Laboratory Specialists even though Laboratory Specialists was not eligible to collect such payments by virtue of its unlawful conduct.

553.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

554.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VI defendants' unlawful conduct described herein.

555.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**COMMON LAW FRAUD**
**Against All Defendants**

556.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 493 set forth above as if fully set forth herein.

557.   The scheme to defraud perpetrated by Michigan Pain, Dearborn Pain, Laboratory Specialists, and Padula ("Count VII defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

558.   The misrepresentations of fact made by the Count VII defendants include those material misrepresentations discussed in section XII.A, *supra*.

559.   The Count VII defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

560.   The misrepresentations were intentionally made by the Count VII defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Allstate.

561.   The Count VII defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

562.   Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

563.   As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

**COUNT VIII**
**CIVIL CONSPIRACY**
**Against All Defendants**

564.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 493 set forth above as if fully set forth herein.

565.   Defendants Michigan Pain, Dearborn Pain, Laboratory Specialists, and Padula ("Count VIII defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

566.   The Count VIII defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

567.   This purpose was known to all of the Count VIII defendants and intentionally pursued.

568.   Indeed, as detailed above, the Count VIII defendants engaged in inter-referrals to each other of the patients they solicited so that each could submit improper bills to Allstate.

569.   The defendants also shared common ownership and management, including defendant Padula.

570.   The defendants also shared facilities, supplies, and equipment as part of their scheme to submit billing to Allstate.

571.   Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count VIII defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

572.   In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

573.   All of the Count VIII defendants directly benefited from the payments made to Michigan Pain, Dearborn Pain, and Laboratory Specialists.

574.   All of the Count VIII defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count VIII defendants in the commission of acts done for the benefit of all Count VIII defendants and to the unjustified detriment of Allstate.

575.   Accordingly, all of the Count VIII defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

<u>**COUNT IX**</u>
**PAYMENT UNDER MISTAKE OF FACT**
**Against Michigan Pain Management PLLC, Dearborn Pain Specialists, PLLC, and Laboratory Specialists of Michigan, LLC**

576.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 493 set forth above as if fully set forth herein.

577.   Allstate paid the amounts described herein under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Michigan Pain, Dearborn Pain, and Laboratory Specialists ("Count IX defendants").

578. Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count IX defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

579. The Count IX defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

580. Allstate is entitled to restitution from each of the Count IX defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

581. The Count IX defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT X
## UNJUST ENRICHMENT
### Against All Defendants

582. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 493 set forth above as if fully set forth herein.

583. Defendants Michigan Pain, Dearborn Pain, Laboratory Specialists, and Padula ("Count X defendants") submitted, caused to be submitted, or benefited from claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

584.   Allstate's payments constitute a benefit which the Count X defendants aggressively sought and voluntarily accepted.

585.   The Count X defendants wrongfully obtained or benefited from payments from Allstate through the fraudulent scheme detailed herein.

586.   The Count X defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XI
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

587.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 493 set forth above as if fully set forth herein.

588.   Defendants Michigan Pain, Dearborn Pain, Laboratory Specialists, and Padula ("Count XI defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

589.   The Count XI defendants also billed for services not rendered.

590.   The Count XI defendants also billed for services pursuant to a fraudulent scheme whereby patients were subjected to a predetermined treatment protocol for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

591.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment

arising out of a motor vehicle accident. Mich. Comp. Laws §§ 500.3105 and 500.3107.

592. The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident. Mich. Comp. Laws § 500.3107.

593. The lack of lawfully-rendered treatment (such as treatment arising from illegal solicitation and unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits. Mich. Comp. Laws §§ 500.3157(1).

594. Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

595. The Count XI defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

596. The Count XI defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count XI defendants for any or all of the reasons set out in the within Complaint.

597. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants billed for unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

598. Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

599. As such, the Count XI defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

600. Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XVI.  **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and ASMI Auto Insurance Company respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Michigan Pain Enterprise)**
**Against Dearborn Pain Specialists, PLLC, Laboratory Specialists of Michigan, LLC, and James Padula, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Michigan Pain Enterprise)**
**Against Dearborn Pain Specialists, PLLC, Laboratory Specialists of Michigan, LLC, and James Padula, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Dearborn Pain Enterprise)
### Against Michigan Pain Management PLLC, Laboratory Specialists of Michigan, LLC, and James Padula, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Dearborn Pain Enterprise)
### Against Michigan Pain Management PLLC, Laboratory Specialists of Michigan, LLC, and James Padula, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT V
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Laboratory Specialists Enterprise)
### Against Michigan Pain Management PLLC, Dearborn Pain Specialists, PLLC, and James Padula, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Laboratory Specialists Enterprise)
### Against Michigan Pain Management PLLC, Dearborn Pain Specialists, PLLC, and James Padula, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
## COMMON LAW FRAUD
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT VIII
## CIVIL CONSPIRACY
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

**COUNT IX**
**PAYMENT UNDER MISTAKE OF FACT**
**Against Michigan Pain Management PLLC, Dearborn Pain Specialists,**
**PLLC, and Laboratory Specialists of Michigan, LLC**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

**COUNT X**
**UNJUST ENRICHMENT**
**Against All Defendants**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

**COUNT XI**
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against All Defendants**

(a)    DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by Michigan Pain Management PLLC, Dearborn Pain Specialists, PLLC, Laboratory Specialists of Michigan, LLC, and James Padula, D.O., jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)    DECLARE that Michigan Pain Management PLLC, Dearborn Pain Specialists, PLLC, Laboratory Specialists of Michigan, LLC, and James Padula, D.O., jointly and severally, cannot seek payment from Allstate pursuant to the

Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)    DECLARE that Michigan Pain Management PLLC, Dearborn Pain Specialists, PLLC, Laboratory Specialists of Michigan, LLC, and James Padula, D.O., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)    GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVII. **DEMAND FOR JURY TRIAL**

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

KTM

*/s/ Andrew H. DeNinno*

_____
Nathan A. Tilden (P76969)
ntilden@ktmpc.com
Andrew H. DeNinno
adeninno@ktmpc.com
Brad A. Compston
bcompston@ktmpc.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Dated:  September 27, 2023      *Attorneys for Plaintiffs*